[L.A. No. 31768. July 16, 1984.]

DORA GARCIA et al., Plaintiffs and Appellants, v.
TRUCK INSURANCE EXCHANGE, Defendant and Respondent.

428

**COUNSEL**

Robert E. Ames and Sanford M. Gage for Plaintiffs and Appellants.

Leonard Sacks, Roberta Ritter, Victoria J. De Goff, Robert E. Cartwright, Wylie A. Aitken, Harlan Arnold, Glen T. Bashore, Ray Bourhis, Richard D. Bridgman, Edwin Train Caldwell, David S. Casey, Jr., J. Nick DeMeo, Harry J. Delizonna, Douglas K. deVries, Paul A. Eisler, Allan F. Grossman, Ian Herzog, Dana Hobart, Stanley K. Jacobs, Harvey R. Levine, John C. McCarthy, Timothy W. Peach, Joseph Posner, John M. Van Dyke, Arne Werchick and Stephen I. Zetterberg as Amici Curiae on behalf of Plaintiffs and Appellants.

Douglas Dalton, Horvitz & Greines, Horvitz & Levy, Ellis J. Horvitz and Barry R. Levy for Defendant and Respondent.

Musick, Peeler & Garrett, James E. Ludlam and Fred J. Hiestand as Amici Curiae on behalf of Defendant and Respondent.

**OPINION**

**GRODIN, J.**—This case concerns the proper interpretation of an insurance policy issued by defendant Truck Insurance Exchange (Truck) to a hospital,

after negotiations between the carrier and the California Hospital Association (CHA), representing hospitals throughout the state. The question is whether that policy provides coverage to a physician who is sued by his own patient for malpractice which he allegedly committed while the patient was in the hospital. The trial court, after considering evidence as to the intent of the parties in negotiations, concluded that the policy provided no such coverage. We affirm.

Plaintiffs in the underlying action were Dora Garcia and her minor children. Plaintiffs' decedent, Gilbert Garcia, was admitted to Queen of Angels Hospital (hospital) on November 29, 1971, as the private patient of Dr. Siegfried Halpern for tests and examination concerning a gastric problem. On November 30, 1971, Dr. Halpern brought Dr. Martin Lewis into the case as a surgical consultant. Dr. Lewis was a surgeon in private practice and a member of the medical staff at the hospital. Staff membership signifies that a physician holds the privilege of practicing at the hospital. Dr. Lewis was not a hospital employee.

From December 1, 1971, until his death on December 10, 1971, Mr. Garcia was Dr. Lewis's private patient. On December 7, 1971, Dr. Lewis performed gastric surgery upon Mr. Garcia. Following that surgery, Mr. Garcia developed symptoms of peritonitis, a condition which can lead to death if not promptly and properly treated. On December 10, 1971, at 1:25 a.m., Dr. Clark (a hospital employee) reported Mr. Garcia's worsening condition to Dr. Lewis by telephone. There is no evidence that Dr. Lewis gave any instructions or orders with respect to his patient's treatment. Mr. Garcia died at approximately 5 p.m. on December 10, 1971.

Plaintiffs commenced a medical malpractice action for wrongful death in December 1972. Defendants included the hospital and Dr. Lewis, as well as two hospital resident-employees, Drs. Clark and Rosenfeld. Truck was the insurer of the hospital and its employees under a comprehensive hospital liability insurance policy. Truck had not issued any insurance policy to Dr. Lewis. Dr. Lewis was not a party to the policy which covered the hospital and its employees. During discovery in the underlying wrongful death litigation, Dr. Lewis testified that he was uninsured against medical malpractice liability.

Early in 1976, prior to any request for defense by Dr. Lewis, Truck substantially completed a settlement on behalf of the hospital and the two resident-employees. All other defendants, except Dr. Lewis, also settled.

On April 1, 1976, for the first time, Dr. Lewis, through his counsel, demanded that Truck defend him and pay attorneys' fees already incurred.[1] A second demand letter threatened that if Truck refused to assume Dr. Lewis's defense, Lewis would stipulate with plaintiffs that he was negligently responsible for the death of plaintiffs' decedent and that his negligence was of a type that would provide him with coverage as an additional insured under the Truck policy covering the hospital and its employees. The letter also stated that Lewis would permit judgment to be entered against him for $602,114.83 and would then assign his rights against Truck to plaintiffs and assist them in any action they brought against Truck.

Truck refused to undertake Dr. Lewis's defense, stating that he was clearly not insured by the hospital's policy. On June 3, 1976, Dr. Lewis's attorneys executed the threatened stipulation and the judgment was entered on September 2, 1976. On March 9, 1977, plaintiffs filed the complaint in this action against Truck under Insurance Code section 11580, subdivision (b)(2)[2] to satisfy the judgment against Dr. Lewis.

At trial, Truck contended that the policy expressly excluded physicians employed by private patients and that hospital staff physicians were insured only with respect to supervisory or instructional services rendered to hospital employees. The trial court then admitted extrinsic evidence to clarify the meaning of the term "supervisory or instructional services." On the basis of this evidence, the trial court ruled that, as to Mr. Garcia's death, Dr. Lewis was not insured under the Truck policy and Truck was not bound by the stipulated judgment.

On appeal, plaintiffs argue principally that the extrinsic evidence was inadmissible and that the trial court erroneously interpreted the policy. In addition, plaintiffs contend they were denied the right to a jury trial and that Truck was bound by the stipulated judgment between plaintiffs and Dr. Lewis due to its refusal to defend. None of these arguments carries the day.

---

[1] The record indicates that in February 1976, Dr. Lewis's counsel had moved to withdraw as attorneys of record on the ground that he refused to pay their legal fees and expenses. At that time, one of the attorneys submitted a declaration stating that Dr. Lewis was then living in Rome and had no intention of returning to the United States to participate in the trial. The motion was denied.

[2] Insurance Code section 11580 provides, in pertinent part: "A policy insuring against losses set forth in subdivision (a) shall not be issued or delivered to any person in this state unless it contains the provisions set forth in subdivision (b). Such policy, whether or not actually containing such provisions, shall be construed as if such provisions were embodied therein. . . . (b) Such policy shall not be thus issued or delivered to any person in this state unless it contains all the following provisions: . . . (2) A provision that whenever judgment is secured against the insured or the executor or administrator of a deceased insured in an action based upon bodily injury, death, or property damage, then an action may be brought against the insurer on the policy and subject to its terms and limitations, by such judgment creditor to recover on the judgment."

Two provisions of the policy are relevant to this dispute. Under the heading of "Exclusions" (par. V), the policy states, in pertinent part: "This policy does not apply: . . . 6. To the liability of any individual hired or employed by or on behalf of a patient at any hospital organization holding a certificate under this policy. . . ." Dr. Lewis was such an individual, and on the basis of this provision was excluded.

Dr. Lewis relies, however, upon the "Definition of Insured" in paragraph III of the policy, which states, in pertinent part: "The unqualified word 'insured' includes each of the following to the extent set forth in this definition: . . . (d) any medical staff member of the named insured or hospital organization . . . but only with respect to his legal liability for providing, or failing to provide, any supervisory or instructional services with respect to employees of the named insured or such hospital organization; . . ."

Dr. Lewis did not generally provide "supervisory or instructional services" at the hospital. Nevertheless, he contends that because the malpractice to which he has admitted consisted of his failure to respond when notified by a hospital employee of his patient's worsening condition, he is for purposes of this case an "insured" within the meaning of the policy.

Truck was permitted to rebut Dr. Lewis's interpretation of the policy through the testimony of James E. Ludlam, general counsel to CHA since 1953. Mr. Ludlam's uncontroverted testimony was to the following effect.

CHA represents 90 percent of the hospitals in California including Queen of Angels Hospital. In 1953, acting on behalf of its member hospitals, CHA negotiated the subject insurance policy with Truck. The policy has been in effect since 1954 and has been amended from time to time since then. Mr. Ludlam represented CHA in both the original negotiations in 1953 and in the 1969 negotiations which resulted in the addition of section III(d) to the policy. In 1953 Truck was a newcomer in the hospital liability field and was anxious to secure an agreement with CHA. CHA had three final proposals for liability insurance to choose from at the time it entered negotiations with Truck. CHA's bargaining position was at least equal to Truck's. The provisions of the policy were negotiated paragraph by paragraph. The exclusionary provision which is now section V(6) has been in the policy from the beginning, and specifically excludes liability for direct patient care by a private doctor of his private patient.

Section III(d) was added in 1970 in response to concerns expressed by staff physicians that they might be exposed to malpractice liability for uncompensated volunteer services rendered to the hospital, such as committee activities and educational services. The term "supervisory" was designed

to cover physicians volunteering on committees or as department heads directing the activities of hospital personnel. The phrase "instructional services" was inserted to protect staff physicians volunteering educational services to resident physicians, interns, nurses and other hospital personnel either in classroom settings or in the charity clinics. In adding section III(d), CHA did not intend to extend coverage under the policy to physicians treating private patients. Such an extension of coverage would have necessitated a substantial increase in insurance premiums. No premium increase accompanied the policy amendment adopting section III(d).

■ Plaintiffs argue that the trial court's admission of Ludlam's testimony was barred by the parol evidence rule.[3] We do not agree. That rule, presently codified in Code of Civil Procedure section 1856 precludes evidence of a prior agreement or of a contemporaneous oral agreement to contradict terms included in a written instrument which the parties intend as the final expression of their agreement, but it does not exclude "other evidence of the circumstances under which the agreement was made or to which it relates . . . or to explain an extrinsic ambiguity or otherwise interpret the terms of the agreement . . . ." (Code Civ. Proc., § 1856, subd. (g).) ■ In *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373], we said: "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." In its comment on subdivision (g) the Law Revision Commission counsels adherence to this criterion.

---

[3]Prior to the 1978 amendment of Code of Civil Procedure section 1856 (amended by Stats. 1978, ch. 150, § 1, p. 374), California authority established that the parol evidence rule had no application in controversies in which a stranger to the contract was a party. Thus, when a stranger to a written contract relied upon it as evidence of a certain relationship between the parties to the contract, the contracting parties were entitled to show their true relation through extrinsic evidence, even if such evidence varied or contradicted the terms of the contract. (See *Smith* v. *Moynihan* (1872) 44 Cal. 53, 64-65; 31 Cal.Jur.3d, Evidence, § 336, p. 422.)

Witkin noted that this rule was firmly established in California, though it had been criticized on principle by commentators. (Witkin, Cal. Evidence (2d ed. 1966) Documentary Evidence, § 747, p. 691.) However, the 1978 amendment to Code of Civil Procedure section 1856 deleted the introductory language limiting the exclusion to disputes ". . . between the parties and their representatives, or successors in interest . . . ," upon which this rule had been based. There is no judicial authority as to the effect, if any, of this deletion upon the former rule. Witkin suggests that the effect of this change is to preclude introduction of extrinsic evidence, where prohibited, in actions involving third parties as well as actions between the contracting parties. (Witkin, Cal. Evidence (1982 supp.) Documentary Evidence, § 747, p. 309.) Neither side raised this issue on appeal. As noted above, the parol evidence rule does not prohibit introduction of Ludlam's testimony in any event.

We have no difficulty in concluding, as did the trial court, that the policy language was reasonably susceptible of the interpretation placed upon it by Mr. Ludlam. Indeed, on its face that appears to be by far the more reasonable interpretation even without Mr. Ludlam's testimony, and one that serves to reconcile what plaintiffs assert to be a "conflict" between paragraphs III(d) and V(6).[4] It seems hardly likely that the policy was intended, or could reasonably be understood, to provide coverage for a physician's negligence toward his own patients when that negligence took the form of negligent supervision or instruction of hospital employees, but not otherwise. Rather, it would appear that, whatever the scope of coverage offered by paragraph III(d), it is explicitly limited by paragraph V(6) to exclude the liability of staff physicians when acting in the employ of their private patients. **(3)** "When a policy of insurance in plain language excludes a particular peril from coverage that language must be respected. [Citations.]" (*Young's Market Co.* v. *American Home Assur. Co.* (1971) 4 Cal.3d 309, 316 [93 Cal.Rptr. 449, 481 P.2d 817].)

Plaintiffs contend that Mr. Ludlam's testimony was irrelevant and immaterial, and that both its admission and the trial court's construction of the policy were contrary to the principle that any ambiguity or uncertainty in an insurance policy is to be resolved against the insurer. (*Crane* v. *State Farm Fire & Cas. Co.* (1971) 5 Cal.3d 112, 115 [95 Cal.Rptr. 513, 485 P.2d 1129, 48 A.L.R.3d 1089].) We have already expressed our view that the policy language, on its face, leaves little room for doubt; but even assuming, for purposes of analysis, that the language in contention could reasonably be regarded as ambiguous or uncertain, the principle of construction which plaintiffs invoke has little application in this context.

Whatever rights Dr. Lewis holds under this policy are the rights of a third party beneficiary. Dr. Lewis was not a party to the insurance contract between Queen of Angels Hospital and its insurance carrier. A putative third party's rights under a contract are predicated upon the contracting parties' intent to benefit him. (*Murphy* v. *Allstate Ins. Co.* (1976) 17 Cal.3d 937, 944 [132 Cal.Rptr. 424, 553 P.2d 584]; 17 Am.Jur.2d, Contracts, § 304, pp. 727-730.) Furthermore, the burden is upon Dr. Lewis to prove that the performance he seeks was actually promised. This is largely a question of interpretation of the written contract. (4 Corbin on Contracts (1951) § 773, pp. 4-6.)

---

[4]Plaintiffs argue that the phrase "any individual hired by or employed by or on behalf of a patient" should be interpreted to exclude from coverage only those individuals with no affiliation whatsoever with the hospital. Plaintiffs' examples include private duty nurses, therapists, cosmetologists, religious practitioners, private secretaries and security guards.

■■ ■■ In determining the meaning of a written contract allegedly made, in part, for the benefit of a third party, evidence of the circumstances and negotiations of the parties in making the contract is both relevant and admissible. And, "[i]n the absence of grounds for estoppel, the contracting parties should be allowed to testify as to their actual intention. . . ." (4 Corbin, Contracts (1971 supp.) § 776, p. 8; see, e.g., *Hoge* v. *Farmers Market & Supply Co. of Las Cruces* (1956) 61 N.M. 138 [296 P.2d 476]; *United States* v. *Springfield Fire & Marine Ins. Co.* (8th Cir. 1953) 207 F.2d 935.)

■■ There is no basis for application of an estoppel theory in this case. Dr. Lewis did not rely upon the terms of this insurance policy to protect him against liability for medical malpractice. Indeed, there is no evidence to suggest that he was even aware of the policy or its terms until several years after Mr. Garcia's death. In 1975 he admitted in deposition that he had no malpractice coverage.

Moreover, had Dr. Lewis relied upon this policy as his only protection against medical malpractice liability, his reliance would have been patently unreasonable. Even under plaintiffs' asserted interpretation of the policy, Lewis would have been protected against malpractice liability only in specific, very limited, instances. But the evidence indicates that, at the time of Mr. Garcia's death, Dr. Lewis carried no medical malpractice insurance whatsoever.

Finally, the evidence is devoid of any suggestion that either the insurance carrier or Queen of Angels Hospital misled Dr. Lewis as to his protection under the policy. There is no suggestion, for example, that Dr. Lewis sought medical malpractice insurance protection from the hospital as a condition of practicing there, nor that he was issued a misleading certificate of insurance erroneously describing the scope of his protection.[5] As noted

---

[5]In a number of cases, our courts have extended coverage to employees asserting claims under employment-related group insurance plans on the basis of reliance upon misleading or incomplete descriptions of coverage issued to employees by the employer. (*Humphrey* v. *Equitable Life Assur. Soc.* (1967) 67 Cal.2d 527 [63 Cal.Rptr. 50, 432 P.2d 746]; *Bass* v. *John Hancock Mut. Life Ins. Co.* (1974) 10 Cal.3d 792 [112 Cal.Rptr. 195, 518 P.2d 1147]; *Jones* v. *Crown Life Ins. Co.* (1978) 86 Cal.App.3d 630 [150 Cal.Rptr. 375, 6 A.L.R.4th 826].)

These cases are distinguished from the instant controversy on a number of bases. In such cases, the employee's claim is based upon an assertion that he or she is a party to the insurance contract. As such, the employee is in a position to assert a claim of reliance upon the language of the contract in a way that a putative beneficiary is not. (See 4 Corbin, Contracts (1951) § 779B, pp. 38-39 [a claimant who is determined not to be a third party beneficiary of a contract cannot create rights in himself by acting in reliance on the contract].) In addition, in the above-mentioned cases, the insurer's liability has explicitly or implicitly been posited on the theory that the employer, in distributing incomplete or misleading descriptions of coverage, acted as the agent of the insurer. The evidence supports no such agency theory in the relationship of Queen of Angels Hospital and Truck with regard to their dealings with Dr. Lewis.

above, Dr. Lewis appears to have been unaware of the existence of the policy and its terms at the time of Mr. Garcia's death.

 In addition, the principle that ambiguities in insurance policies must be strictly construed against the insurer stems, primarily, from a recognition of the typical relationship between the parties. Ordinarily, we are faced with a conflict between the purchaser of an insurance contract and the insurance carrier. In such cases, it is typically the carrier who drafts the insurance contract, unilaterally, and for policy reasons is thus held responsible for any ambiguity in language. (*Bareno* v. *Employers Life Ins. Co.* (1972) 7 Cal.3d 875, 878 [103 Cal.Rptr. 865, 500 P.2d 889]; see also *State Farm Mut. Auto. Ins. Co.* v. *Partridge* (1973) 10 Cal.3d 94, 102 [109 Cal.Rptr. 811, 514 P.2d 123] ["all ambiguities in an insurance policy are construed against the insurer-draftsman"].) And, in the typical situation, the policy represents a contract of adhesion "entered into between two parties of unequal bargaining strength, expressed in the language of a standardized contract, written by the more powerful bargainer to meet its own needs, and offered to the weaker party on a 'take it or leave it' basis . . . ." (*Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 269 [54 Cal.Rptr. 104, 419 P.2d 168].) These factors are not present here. The terms of this policy were negotiated between the carrier and CHA, and the language in contention was the product of joint drafting. And, it is apparent that CHA, acting as representative of hospitals throughout the state and in a favorable competitive position, enjoyed substantial bargaining power vis-à-vis the carrier.[6]

 There remains, of course, the fundamental proposition that an *insured* is entitled to no less protection under an insurance policy than a person in his situation would reasonably expect. (*Holz Rubber Co., Inc.* v. *American Star Ins. Co.* (1975) 14 Cal.3d 45, 56-60 [120 Cal.Rptr. 415, 533 P.2d 1055, 79 A.L.R.3d 518].) Denying Dr. Lewis coverage under this policy is consistent with this proposition. Under the circumstances presented here, Dr. Lewis was clearly not an insured under the policy, nor could he have had any reasonable expectation of protection from liability for Mr. Garcia's death.

---

[6]See also 13 Appleman, Insurance Law and Practice (1981) section 7402, pages 300-301: "[W]here an employees' group annuity contract was drafted in conferences between representatives of both parties, it was held that the rule of strict construction need not necessarily be applied. Furthermore it has been held that the principle that ambiguities in policies should be strictly construed against the insurer need not be strictly adhered to in instances where one large corporation and one large insurance company both advised by competent counsel do business with each other. [Fns. omitted.]"

██ Plaintiffs' other objections to the admission of Ludlam's testimony are equally without merit,[7] as is their claim that they were denied right to trial by jury. Plaintiffs requested a jury, and the trial court incurred a serious risk when it proceeded to hear Ludlam's testimony without one, but as it happened the risk did not materialize, Ludlam's testimony being undisputed. It is solely a judicial function to interpret a written contract unless the interpretation turns upon the credibility of extrinsic evidence, even when conflicting inferences may be drawn from uncontroverted evidence. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865, 866, fn. 2 [44 Cal.Rptr. 767, 402 P.2d 839].) ██ ██ ██ We conclude that Ludlam's testimony was properly admitted and considered, and that the trial court's interpretation of the policy was correct.

██ Finally, we reject plaintiffs' contention that Truck is bound by the stipulated judgment between them and Dr. Lewis. Assuming, arguendo, that Truck would have been bound had it had a duty to defend Dr. Lewis, that duty is premised upon a finding that the policy provisions reasonably led the insured to expect to be defended (*Wint* v. *Fidelity & Casualty Co.* (1973) 9 Cal.3d 257, 263-265 [107 Cal.Rptr. 175, 507 P.2d 1383, 90 A.L.R.3d 1185]), and no such finding was or could be made here. Rather, as in *Wint,* neither Queen of Angels Hospital, the named insured, nor Dr. Lewis, the would-be additional insured, could reasonably have expected that Truck would undertake Lewis's defense under these circumstances.

The judgment of the trial court is affirmed.

Kaus, J., Broussard, J., Reynoso, J., and Markey, J.,* concurred.

**MOSK, J.**—I concur in the judgment, but I cannot agree that the testimony of the attorney who *negotiated* the insurance agreement was admissible. That testimony is a classic example of a violation of the parol evidence rule.

Since 1872, section 1625 of the Civil Code has provided that "The execution of a contract in writing, whether the law requires it to be written or

---

[7]On appeal, plaintiffs advanced a relevancy objection, arguing that the policy is a contract between Queen of Angels Hospital and Truck and, thus, evidence of negotiations between CHA (a nonparty) and Truck is irrelevant. In fact, the policy is a "certificate policy." The basic agreement is between CHA, the named insured, and Truck. By its terms, the policy insures CHA "or any hospital organization to which a certificate has been issued under this policy. . . ." Queen of Angels holds a certificate issued May 1, 1971. Thus, CHA and Queen of Angels are both parties to the contract.

In addition—in spite of plaintiffs' assertions to the contrary—it is clear from Ludlam's testimony that CHA acted as the representative of its member hospitals in negotiating the policy. Queen of Angels was a CHA member in 1970, when section III(d) was adopted. In any case, plaintiffs did not object to the admission of Ludlam's testimony on this basis at trial.

*Assigned by the Chairperson of the Judicial Council.

not, *supersedes all the negotiations* or stipulations concerning its matter which preceded or accompanied the execution of the instrument." (Italics added.) To allow an attorney to give his obviously self-serving opinion of what the parties had in mind when they negotiated for the policy does violence to the unambiguous code section.

The case upon which the majority rely, *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373], is an aberration, as I pointed out in my dissent in *Delta Dynamics, Inc.* v. *Arioto* (1968) 69 Cal.2d 525, 530 [72 Cal.Rptr. 785, 446 P.2d 785]. Use of parol evidence to elaborate on the terms of a contract renders the written word, heretofore deemed immutable, to be subject to alteration and expansion. What is written today may be reconstructed orally tomorrow. A rule that encourages or permits recitals of what the parties are believed to have meant, often based on fading memories of antecedent events and interpretation of the conduct and intent of others, has an untoward effect on the stability of the law of contracts and evidence.

The majority conclude that "the policy language was reasonably susceptible of the interpretation placed upon it by Mr. Ludlam." Therein lies the evil of admitting parol evidence: the attorney who negotiated the written contract is allowed to place his interpretation on contract language, a function that should rest exclusively with the trial court.

Nevertheless, I agree with the majority that the insurance policy is clear on its face and on that basis alone—disregarding the erroneously admitted testimony of the attorney—the judgment must be affirmed.

Bird, C. J., concurred.