[No. A018176. First Dist., Div. Three. Mar. 29, 1985.]

WESTERN MEDICAL ENTERPRISES, INC.,
Plaintiff and Respondent, v.
MATHILDE ALBERS, Individually and as Executrix, etc.,
Defendant and Appellant.

COUNSEL

Loube, Lewis, Lowen, Klein & Lando, Michael Weisberg and David R. Medlin for Defendant and Appellant.

Buchman, Kass, Morgan & Miller, Kenneth M. Miller and Bradley K. Miller for Plaintiff and Respondent.

OPINION

WHITE, P. J.—Defendant and appellant Mathilde Albers, individually and as executrix of the estate of Henry Albers, has appealed from the judgment of the Superior Court of Alameda County in favor of plaintiff and respondent Western Medical Enterprises, Inc. The controversy in the trial court involved the construction of a lease entered into between respondent as lessee and appellant and others as lessors. The lease provided that respondent would operate a convalescent hospital on the leased premises for a 20-year term. At issue is the interpretation of the provision in the lease which requires respondent to pay as rent to lessors, a percentage of its gross sales. The trial court determined that certain Medi-Cal payments should not be construed as gross sales. We agree and affirm the judgment.

On January 31, 1974, respondent entered into a lease with appellant and others. Pursuant to the lease respondent agreed to lease the Driftwood Convalescent Hospital, Santa Rosa, California, for a 20-year term. An amendment to the lease, executed the same day, provided that respondent would pay a fixed minimum monthly rental until December 31, 1978, and after that date in addition to the minimum monthly rental respondent would pay 12½ percent of "gross sales."

Throughout the lease, Medi-Cal supported patients have constituted a majority of the patients at the facility. At the time the lease was negotiated and executed, all Medi-Cal payments to convalescent facilities were unrestricted

funds which could be allocated by each facility as it saw fit. Payments under the former Medi-Cal structure provided a margin for profit and overhead.

*Statutory Provisions*

In March 1976, Assembly Bill No. 3619 was introduced in the California Legislature requiring long-term health care facilities (such as the Driftwood Convalescent Hospital) to adopt approved training programs for nursing assistants working in the facility, required those assistants to be certified or enrolled in certain programs, and required the state Department of Health to provide rate adjustments to such facilities under the Medi-Cal program for additional costs incurred pursuant to the program with respect to Medi-Cal patients. The rate adjustments were to commence no later than July 1, 1977; and after July 1, 1978, no nurse assistant could be employed by such a facility without first being certified as having completed a training program or having enrolled in a training program. The bill became codified in Business and Professions Code section 2881.1 and Health and Safety Code sections 1439.1 through 1439.8. (Stats. 1976, ch. 1202, § 2, p. 5479.) Former Health and Safety Code section 1439.1 provided in pertinent part: "The Legislature finds that the quality of patient care in long-term health facilities is dependent upon the competence of the personnel who staff its facilities. The Legislature further finds that direct patient care in long-term health care facilities is currently rendered largely by persons without adequate training." (Stats. 1976, ch. 1202, § 2, p. 5479.) Health and Safety Code sections 1439.1 through 1439.8 were repealed in 1978. (Stats. 1978, ch. 351, §§ 2-9, p. 741.)

Later in March 1976, another Assembly Bill, No. 4242, was introduced and later enacted, but was to remain in effect only until January 1, 1978. (Stats. 1976, ch. 1207, § 3, p. 5497.) This bill required the director of health to establish a reimbursement rate for intermediate and skilled nursing facilities (including the Driftwood Convalescent Hospital) sufficient to provide an average wage increase of a specified amount for all nonadministrative employees of such facilities. In enacting this bill the Legislature declared that the high rate of turnover of direct patient care staff diminishes the quality of care and the turnover is substantially attributable to the low wages paid said staff. The legislation was codified in former Welfare and Institutions Code sections 14090 to 14094.

In April 1977, Assembly Bill No. 1426 was introduced which, in effect, took up where Assembly Bill No. 4242 left off and required the director of health to establish a reimbursement rate, effective March 1, 1978, which was sufficient to provide wage and benefit increase for nonadministrative employees of $2.28 per patient-day for skilled nursing facilities and $1.84

per patient-day for intermediate care facilities. (Stats. 1978, ch. 19, pp. 79-82.) In enacting this bill the Legislature declared: "It is the intent of the Legislature that Medi-Cal reimbursement rates for skilled nursing facilities and intermediate care facilities, to the extent feasible, be set at levels sufficient to allow such employees to be paid at wages which are sufficient to reduce turnover among such employees, in order to improve the level and quality of patient care." (Stats. 1978, ch. 19, § 2, subd. (a), p. 80.) Part of Assembly Bill No. 1426 was codified as Health and Safety Code section 1268.5.

The provisions of Assembly Bill No. 1426 required each facility to certify that it was using the additional funds for their designated purpose. The Legislation also required the director of health to inspect relevant payroll and personnel records to insure that the wage increases provided for had been implemented. (Stats. 1978, ch. 19, § 2, subd. (e), p. 81.) In the event that a facility was found not to be complying, it was liable to the state for the amounts reimbursed, plus a penalty equal to 10 percent of the funds not so distributed. (Stats. 1978, ch. 19, § 2, subd. (f), p. 81.)

*Lease Provisions*

The lease provisions pertaining to "gross sales" provide: "(D) Provided further that in addition to the minimum net monthly rentals herein agreed to be paid by Lessee and provided for in this paragraph 32, and commencing on the 1st day of January, 1979, Lessee shall and will pay to Lessor at the times and in the manner hereinafter specified an additional rental in an amount equal to 12½% of the amount of Lessee's gross income and sales (as gross income and sales are hereinafter defined) made during each month of the term hereof in, upon or from the demised premises, less the amount of the minimum monthly rental paid by Lessee during said month.

"(i) The term 'gross sales' as used herein shall (subject to the exceptions and authorized deductions as herein set forth) mean the gross amount of income received by Lessee from all services rendered by Lessee and/or sales made by Lessee on the premises, including charges for nursing care rendered, pharmaceuticals or drugs furnished or supplied to patients, therapy rendered and performed, and all other income of any nature received by Lessee from services rendered or goods, wares, merchandise, pharmaceuticals or supplies dispensed or supplied in, on or from the demised premises and including the gross amount received by Lessee from any and all other sources of income derived from business conducted upon the demised premises.

"(ii) There is excepted from Lessee's gross sales, as herein defined, the amount of any sales tax receipts received by Lessee which in turn must be

accounted for and paid by Lessee to any governmental agency. There shall further be deducted from Lessee's gross sales (gross income) for purpose of accounting to Lessor, the amount of any refunds or credits made by Lessee for refunds to any patients or the estate or personal representative of any patients, the amount of which had previously been included by Lessee in Lessee's gross sales."

The amendment to the Lease executed the same day as the lease defines "gross sales" in the following manner: "(i) The term 'gross sales' as used herein shall (subject to the exceptions and authorized deductions as hereinafter set forth) mean the gross amount received by Lessee from all room rentals, medical care and nursing services, and food and board products and services, both for cash and on credit, and in case of credit whether or not payment be actually made therefor; all charges for such room and board made in or upon the demised premises; all without deduction for any expenses, rent, depreciation or any other offsetting amounts except as hereinafter provided."

*Trial Court Proceedings*

After a two-day court trial, the trial court made findings of fact and conclusions of law and entered judgment in favor of respondent.

The trial court found that at the time the lease was entered into the Medi-Cal formula for reimbursement to hospital operators, such as respondent, did not require the allocation of any funds to a specific hospital service. Based on the evidence, the trial court found that as of the date the lease was entered into, the Medi-Cal reimbursement formula to long-term health facilities was based on a theory of cost reimbursement plus overhead and profit and periodic cost-of-living increases.

Subsequent to the negotiation and signing of the lease, the Legislature enacted Assembly Bills Nos. 4242, 3619 and 1426, which provided for additional Medi-Cal payments. These bills required respondent to expend the additional funds for the specific purpose specified in the bills. The court found that respondent received the additional funds and expended the funds for the purpose specified in the bills. The court further found that if respondent had not expended all of the funds for the purpose specified, it would be subject to a ten percent statutory penalty.

Dispositive of the case was the trial court's finding that at the time the lease was executed, the parties had no intention that any funds received from Medi-Cal, which were required to be applied by respondent in their

entirety to a specified purpose, should be included within the term "gross sales" as that term is used in the lease and the amendment thereto.

Appellant contends on appeal that in order for the trial court to make the findings of fact and conclusions of law it did, it had to ignore the definition of "gross sales" contained in the lease and the amendment thereto. Appellant states the "flaw in the Court's reasoning is that the parties, in writing, defined 'gross sales' as 'without deduction for any expenses.'" Appellant further contends that the trial court erred in admitting expert testimony regarding the interpretation of Medi-Cal rules and regulations.

*Discussion*

■ The interpretation of a written instrument is essentially a judicial function to be exercised according to the generally accepted canons of interpretation. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].) We must make an independent interpretation of a written agreement if no extrinsic evidence was introduced in the trial court, or if there is no conflict in the evidence, or if a determination has been made upon incompetent evidence. (*Id.; Western Camps, Inc.* v. *Riverway Ranch Enterprises* (1977) 70 Cal.App.3d 714, 722-723 [138 Cal.Rptr. 918]; *Estate of Newmark* (1977) 67 Cal.App.3d 350, 360 [136 Cal.Rptr. 628].) But even under these circumstances we must determine that the trial court's interpretation of a written contract is erroneous (i.e., not as tenable as our interpretation) before we may properly reverse a judgment. (*Sayble* v. *Feinman* (1978) 76 Cal.App.3d 509, 512-513 [142 Cal.Rptr. 895]; *Estate of Newmark, supra,* at p. 360.) However, if the interpretation of the contract turns upon the credibility of extrinsic evidence, we are bound by the trial court's construction of the agreement if it is reasonably susceptible to that interpretation. (*Glendale Fed. Sav. & Loan Assn.* v. *Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 134 [135 Cal.Rptr. 802]; *Brawthen* v. *H & R Block, Inc.* (1972) 28 Cal.App.3d 131, 138 [104 Cal.Rptr. 486]; *Kaufman & Broad Bldg. Co.* v. *City & Suburban Mortg. Co.* (1970) 10 Cal.App.3d 206, 216 [88 Cal.Rptr. 858].)

■ "'The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.'" (*Garcia* v. *Truck Ins. Exchange* (1984) 36 Cal.3d 426, 435 [204 Cal.Rptr. 435, 682 P.2d 1100].)

As respondent correctly points out, percentage rent provisions, like the one at issue, serve a dual purpose. "Primarily, percentage rent is intended

to provide additional revenue to the landlord in the event the tenant's business thrives during the term of the lease. In effect, the landlord becomes a partner sharing in the commercial success or failure of his tenant. Secondarily, percentage rent gives a tenant the security of knowing that its rental payments will only increase as the tenant's business increases and prospers. The tenant's intent in entering into a percentage rent lease is to ensure that his rental payments will not become overly burdensome if the business experiences either a general decline or low level of sales."

▮▮▮ The trial court's express finding that the parties did not intend the definition of "gross sales" to include the Medi-Cal payments specified for nonadministrative employees, the payments at issue in the instant case, is reasonable in light of the dual purpose of percentage rent provisions. The additional payments did not reflect an increase in the level or volume of business or of additional monies available to the convalescent hospital. The funds provided by the instant Medi-Cal provisions were intended by the Legislature to alleviate what the Legislature perceived as critical deficiencies in the level and quality of care in the nursing home industry. The additional funds, which were required to be passed on in their entirety to the employees, did not reflect any increase in respondent's business, but instead went to the sole benefit of the nonadministrative employees in the form of increased wages and requisite training programs.

The inclusion of the additional Medi-Cal payments in the definition of "gross sales" as urged by appellant, is also unreasonable in light of the secondary purpose underlining percentage rent agreements. The parties in entering into the lease at issue could not have contemplated or foreseen the subsequent enactment of the additional Medi-Cal provisions nearly three years after the negotiations and execution of the lease. Absent any element of profit in the additional Medi-Cal payments, the inclusion of such payments in the calculation of "gross sales" would result in an increase in rent without an increase in profits. Such a rent increase would actually result in a decrease in respondent's income.

The issue in the instant case is analogous to the question presented to the court in *Herbert's etc., Inc.* v. *Laurel, etc. Corp.* (1943) 58 Cal.App.2d 684 [138 P.2d 43]. As in the instant case, *Herbert's* involved the judicial construction of a percentage rent clause which based rental payments on a percentage of "gross receipts." The lessor in *Herbert's* contended that tips paid to employees constituted "gross receipts" within the definition contained in the lease. The appellate court rejected the lessor's argument and held that the money received from customers and paid to employees did not constitute "gross receipts" to the lessee. The court based its holding on the

lessee's argument that the payments went directly to the employees and did not benefit the lessee.

In the instant case, as in *Herbert's,* the payments at issue are received from a third source (Medi-Cal), intended for the sole benefit of the employees, paid directly to the employees, contain no element of profit and do not benefit the lessee. As the court recognized in *Herbert's,* the payments logically are not "income" to the lessee and should not be included in the calculation of percentage rent due.

We are therefore of the opinion that even if no extrinsic evidence had been received at the trial we would have to affirm the trial court's interpretation of the lease in question. Given the above discussion it is clear that the trial court's interpretation of the lease is not erroneous. But in the instant case extrinsic evidence was received and therefore our role on appeal is even more limited. In such a case, as noted above, we are bound by the trial court's construction of the lease if it is reasonably susceptible to that interpretation.

The trial court heard testimony from Allan Fisher, president of respondent, as to the intent of the parties in entering into the lease. Fisher, who negotiated and executed the lease and amendment on behalf of respondent, testified that at the time of execution of the lease, he was not aware of any proposed legislation modifying the Medi-Cal rate structure. Fisher further testified, and appellant does not refute, that at the time of the negotiation of the lease and amendment, there had been no discussions between Fisher and appellant relating to the possibility that the historical Medi-Cal rate structure could change.

In light of the ambiguity as to the parties' intent in entering into the lease, the court also accepted extrinsic evidence as to the parties' conduct subsequent to the signing of the lease. ■ The rule is well settled that where a contract is ambiguous, the court may consider the subsequent conduct of the parties for the purpose of discovering their intent in entering into a contract. (*Tanner* v. *Title Ins. & Trust Co.* (1942) 20 Cal.2d 814, 823 [129 Cal.Rptr. 383].) It is generally recognized that the acts of the parties to a contract afford one of the most reliable means of arriving at their intention. (*Commercial Discount Co.* v. *Cowen* (1941) 18 Cal.2d 610, 615 [116 P.2d 599].) The construction given a contract by the parties before any controversy has arisen as to meaning will, when reasonable, be adopted by the courts. (*Universal Sales Corp.* v. *Cal. etc. Mfg. Co.* (1942) 20 Cal.2d 751, 761 [128 P.2d 665].)

■ Allan Fisher testified that subsequent to the enactment of the relevant Medi-Cal provisions, he met with several of the other lessors and

related respondent's position that the additional Medi-Cal payments did not constitute "gross sales" and should not be included in the calculation of percentage rent. One of the lessors present at the meeting testified at trial that he agreed with respondent's position that the parties did not intend that the additional payments would be included in "gross sales."

Given the above extrinsic evidence, we are bound by the trial court's construction of the lease, since it is reasonably susceptible to that interpretation.

Finally, appellant contends that the trial court admitted incompetent evidence when it permitted Herberth and Fisher to testify regarding their interpretation of Medi-Cal rules and regulations. Appellant cites *Elder* v. *Pacific Tel. & Tel. Co.* (1977) 66 Cal.App.3d 650, 664 [136 Cal.Rptr. 203], for the proposition that expert testimony is not permitted on the interpretation of statutes and ordinances. Most of appellant's citations to the transcript do not contain testimony by Herberth and Fisher, but merely objections interposed by appellant's counsel. At no point in the record cited by appellant does witness Herberth or witness Fisher testify as to the proper judicial interpretation of Medi-Cal rules and regulations.

Leonard Herberth who was qualified as an expert testified as to the Medi-Cal reimbursement framework that existed at the time the lease was entered into as well as his personal knowledge as to the historical administration of the Medi-Cal reimbursement program. We are of the opinion that this testimony was properly received.

The judgment is affirmed.

Barry-Deal, J., and Anderson, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.