[No. D002538. Fourth Dist., Div. One. May 23, 1986.]

In re the Marriage of CYNDEE L. and ROBERT A. HORN.
ROBERT A. HORN, Appellant, v.
CYNDEE L. HORN, Respondent.

## COUNSEL

Wright & L'Estrange, John C. O'Neill, Robert C. Wright, Bruney & Bruney and Kim M. Bruney for Appellant.

Lightner & Castro, John C. Lightner and Leslie A. Cummings for Respondent.

## OPINION

**WORK, J.**—Robert Horn appeals a judgment awarding Cyndee L. Horn a community interest in his severance pay received from the National Football League.

I

The parties married on June 8, 1974, and separated on January 25, 1983. Robert was employed as a professional football player from 1976 to 1984, playing with the National Football League during the 1976 through 1983 seasons and with the New Jersey Generals of the United States Football League during the 1984 season. After the 1984 season, he was released from the Generals, and at the time of trial (Aug. 1984), was unemployed.

In 1982, the National Football League Players Association (Union) and the management of the National Football League (NFL) added a "severance pay" provision to their collective bargaining agreement (CBA) which provides that any player credited with two or more seasons with the NFL is entitled to receive a lump sum of severance pay,[1] computed on how many seasons played with the NFL.

---

[1]The severance provision states: "Section 1. Amount: Effective November 16, 1982, any player who has earned two (2) or more Credited Seasons under the Bert Bell NFL Player Retirement Plan and leaves the National Football League, will be entitled to receive from the last NFL club to which he was under contract a severance payment in accordance with the following schedule:

| "Credited Seasons | Last NFL Season 1982, 1983 or 1984 | Last NFL Season 1985 or 1986 |
|---|---|---|
| "Two | $ 5,000 | $ 10,000 |
| "Three | 20,000 | 30,000 |
| "Four | 60,000 | 70,000 |
| "Five | 70,000 | 80,000 |
| "Six | 80,000 | 90,000 |
| "Seven | 90,000 | 100,000 |
| "Eight | 100,000 | 110,000 |
| "Nine | 110,000 | 120,000 |
| "Ten | 120,000 | 130,000 |
| "Eleven | 130,000 | 140,000 |
| "Twelve or more | 140,000 | 150,000 |

"For the 1982 season only, a player who was on any club's Active, Inactive, Injured Reserve or Physically Unable to Perform list on the dates of a club's first two regular season games will be deemed to have earned a Credited Season for purposes of this Article only and for no other purpose, including pension plan purposes.

"Section 2. Payment: The foregoing severance payment will be paid to the player immediately following the third game of the NFL regular season next following the player's leaving the National Football League or any other professional football league, whichever occurs later. The amount of the severance payment will be prorated among all clubs to which a player was under contract during his NFL career, except in the case of a player who left the NFL prior to September 20, 1982 and returns to a club after the execution of this Agreement, in which case the player will be entitled to only one-half of his accrued severance benefit and the club to which the player returns will be responsible for one-quarter of his accrued severance benefit as well as any full severance benefit earned following his return. A player may not qualify for more than one severance payment under this provision."

In October 1983, the Union and the NFL entered into a settlement agreement interpreting the severance provision of the CBA. The agreement requires the player send a letter expressing his intention to permanently retire from professional football and execute a demand note providing that should he return to professional football (in the NFL or any other league) within 12 months from the date of receipt of the severance pay, he shall pay back the severance pay received and accrue no more severance pay for the seasons he plays after his return. However, the agreement provides he shall have the right to have the severance pay paid to him again when he permanently retires. The agreement specifies when the player shall receive the severance pay, which depends on when he notifies the NFL club of his intent to retire, and provides for withholding of severance pay if the NFL believes the player has not permanently retired, and for a grievance-arbitration procedure to settle the dispute. Finally, the agreement states that if the player dies, his stated beneficiary or estate shall receive his severance pay.[2]

---

[2]The settlement agreement states in pertinent part: "The following interpretation of Article XXIV of the 1982 CBA, the meaning of which is in dispute between the NFL Players Association ('NFLPA') and the NFL Management Council ('NFLMC'), is agreed upon by the NFLPA and the NFLMC in full and complete settlement of the non-injury grievance filed by the NFLPA against the NFLMC on May 13, 1983, as amended on September 20 and 23, 1983, and shall be binding on the NFLPA, the NFLMC, and all NFL clubs and all NFL players who qualify for benefits pursuant to Article XXIV:

"1. Any player eligible for severance pay under Article XXIV of the 1982 CBA who intends to permanently retire from professional football, by reason of injury or otherwise and whether or not under an NFL player contract at the time of retirement, and sends a letter expressing his intention to so retire from professional football to his last NFL club, with copies to the NFLPA and the NFLMC, which letter is postmarked between the date of the first NFL regular season game of one calendar year (e.g., September 4, 1983) and May 15 of the next calendar year (e.g., May 15, 1984) shall be entitled to receive his severance pay on the day following the third game of the next NFL regular season after said May 15 (e.g., September 17, 1984); provided that:

"a. The player has not participated in football playing activities in the NFL or any other professional football league, or signed a contract to participate in the future in said activities in any other professional football league, between the end of the prior NFL season and the date of receipt of his severance pay; and

"b. prior to receipt of his severance pay, the player executes a demand note, in a form agreeable to the NFLPA and NFLMC, providing that in the event he returns to football playing activities in the NFL or in any other professional football league within twelve (12) months from the date of receipt of his severance pay:

"(1) he shall. be obligated to return the amount of severance pay to the NFL club which paid it prior to beginning renewed football playing activities;

"(2) he shall have no right to have said severance pay paid back to him until he again satisfies this Settlement Agreement procedure; and

"(3) he shall have no right to accrue any additional severance pay for seasons occurring after his return to football playing activities.

". . . . . . . . . . . .

"3. In the event a club obligated to pay a player severance pay under Paragraph 1 or 2 of this Settlement Agreement reasonably believes that the player has not, in fact, permanently retired from professional football, that club may withhold payment so long as it telexes or mails written notice of such action to the NFLPA and NFLMC and the player no later than the scheduled date for payment. The player may thereafter submit a grievance to the NFLPA

The CBA also contains a retirement plan provision and a termination pay provision.[3]

Robert is eligible for a lump sum severance payment of $100,000, based on his eight seasons with the NFL.[4]

## II

In *In re Marriage of Skaden* (1977) 19 Cal.3d 679 [139 Cal.Rptr. 615, 566 P.2d 249], the California Supreme Court found termination benefits to be community property. *Skaden* involved termination pay payable to an insurance sales agent under an employment agreement, which provided for

and NFLMC within ten (10) days of receiving such notice. If the Executive Directors of the NFLPA and NFLMC cannot resolve the matter within seven (7) days of receipt of the grievance, the issue of whether or not the player has, in fact, permanently retired from professional football will be submitted for expedited arbitration to a non-injury grievance arbitrator designated for such purpose, which arbitrator shall render a final decision as soon as possible after a hearing on the matter, which may be a bench decision if the arbitrator so desires . . . .

". . . . . . . . . . . . . . . . . . .

"6. In the event a player eligible for severance pay under Article XXIV of the 1982 CBA dies, the player's stated beneficiary or, in the absence of a stated beneficiary, the player's estate shall be entitled to receive his severance pay on the day following the third game of the NFL regular season following his death or on the April 15 following his death, whichever occurs first.

"7. Any dispute involving this Settlement Agreement shall be resolved under Article VII of the 1982 CBA, the non-injury grievance procedure, as modified herein." The omitted paragraphs of the agreement are essentially the same as paragraph one, differing only as to the date of receipt of the severance payment based on the date of notification of retirement.

[3]The CBA refers to the "Bert Bell NFL Player Retirement Plan and Trust Agreement," which is not included in the record on appeal. The parties agreed to transfer the NFL retirement benefit to Robert as part of the division of community property. The termination pay provision states: "Section 1. Payment: Effective after the execution of this Agreement, any player who has completed the season in which his fourth year or more of Credited Service under the Bert Bell NFL Player Retirement Plan has been earned, and is released from the Active List, Inactive List or Injured Reserve List of his club after the commencement of the regular season schedule, but prior to the Thursday before the eighth regular season game, is entitled to claim and receive, after the end of the regular season schedule, termination pay in an amount equal to the unpaid balance of the initial 50% of his salary, exclusive of deferred compensation, but not less than an amount equal to one week's salary, up to a maximum of $6,000; provided, however, that (a) the player will not be entitled to such termination pay if he has signed a contract with another club for that same season; and (b) a player will not be entitled to such termination pay more than once during his playing career in the NFL.

"Section 2. One Week: Any player who otherwise qualifies for termination pay under Section 1 above, but is released during the regular season after the time he would be entitled to the unpaid balance of the initial 50% of his salary, will receive termination pay in an amount equal to one week's salary, up to a maximum of $6,000." Apparently Robert was not eligible for termination pay since he was not released from the NFL *during* a season.

[4]In Robert's brief to the trial court, he stated he could receive the $100,000 in April 1985, if he does not return to professional football and applies for the payment by the first game of the 1984-1985 season.

the benefits after two or more years of employment, based on percentages of net premiums collected within a five-year period after termination on policies credited to the agent's account. Payments were to be made on an installment basis, and subject to limitations on competitive activities by the terminated agent.[5]

*Skaden* rejected the argument the payments were "consideration for termination" because nothing in the agreement so suggested, and since termination could be involuntary (i.e., upon death or the company's notice, rather than the agent's notice). *Skaden* also rejected the argument the payments were consideration for compliance with specified conditions (i.e., the agent's forbearance from engaging in competitive activities), since the amount of payment did not depend on the degree of compliance with the conditions, but related directly to the policies credited to the agent's account at the time of termination. *Skaden* concluded the benefits were, like pension benefits, "a form of deferred compensation for services rendered," noting the right to the benefits were "derived from the terms of the employment contract" and became vested after two years of employment. (*Id.,* at pp. 686-867.)

In contrast, *In re Marriage of Flockhart* (1981) 119 Cal.App.3d 240 [173 Cal.Rptr. 818], *In re Marriage of Wright* (1983) 140 Cal.App.3d 342 [189 Cal.Rptr. 336], and recently, *In re Marriage of Kuzmiak* (1986) 176 Cal.App.3d 1152 [222 Cal.Rptr. 644], found various types of termination pay to be separate property.

*Flockhart* involved "weekly lay-off" benefits paid by the United States to an employee adversely affected by the government's expansion of Redwood National Park. *Flockhart* equated the benefits to disability and workers' compensation benefits given, because of an employee's *status* as a disabled person, to presently compensate for loss of earnings, not to compensate for services previously rendered. The undisputed purpose of the Redwood Employee Protection Program was to replace lost income, the payments were reduced by present earnings, and the payments were not received because of any contractual agreement, but because of the employee's status as an "affected employee." (*In re Marriage of Flockhart, supra,* 119 Cal.App.3d 240, 243.) *Flockhart* distinguished *Skaden* as involving a contractual right for deferred compensation. (*Flockhart, supra,* at p. 243, fn. 2.)

*Wright* considered employee termination pay as a voluntary payment by the employer, and not as part of the employment contract. The employer,

---

[5]The terminated agent could not sell competitive insurance coverages to policyholders credited to his account, or engage in the insurance business within 25 miles of his principal place of business at the date of termination, for 1 year following termination. (*In re Marriage of Skaden, supra,* 19 Cal.3d 679, 684, fn. 4.)

a hospital administrator, testified he paid the money because he recognized the employee would have difficulty securing further employment because the employee's father-in-law (the hospital chaplain) and the employee's wife had threatened to ruin him financially, professionally, and personally. The benefits were considered analogous to those in *Flockhart* and the disability benefits cases, noting that in the latter the compensation is for future loss of earnings even if the right to the payments accrued during marriage. (*Wright, supra,* 140 Cal.App.3d 342, 344-345.) *Wright* distinguished *Skaden* because it involved a contract right payable irrespective of continued employment, whereas in the disability cases, they were made because employment was no longer available.

*Kuzmiak* involved military separation pay to personnel discharged because they fail to be promoted, and based on the number of years served and annual salary. The legislative history of 10 United States Code section 1174, states: "The separation pay is a contingency payment for an officer who is career committed but to whom a full military career may be denied. It is designed to encourage him to pursue his service ambition, knowing that if he is denied a full career under the competitive system, he can count on an adequate readjustment pay to ease his reentry into civilian life." (*In re Marriage of Kuzmiak, supra,* 176 Cal.App.3d 1152, 1157.)

*Kuzmiak* noted that California courts have analyzed the purpose of termination benefits to determine their community or separate property character, citing *Skaden, Wright,* and *Flockhart. Kuzmiak* concluded Congress did not intend separation pay to be compensation for past services, and that under the reasoning of *Flockhart* and the disability cases the payment was separate property. However, *Kuzmiak* further found there was a community property interest in the severance pay if the member reenlisted after his discharge, and therefore received a longevity pension after serving 20 years, since, under 10 United States Code section 1174(h)(1), all of the separation pay is deducted from the retired pay. Thus, if the member reenlisted and later received retired pay, the spouse will have an interest in the separation pay the government will withhold from the retirement benefits. *Kuzmiak* noted: "If a member reenlists after involuntary discharge and subsequently receives a longevity pension after serving 20 years, the purposes of the separation pay have not been fulfilled." (*In re Marriage of Kuzmiak, supra,* 176 Cal.App.3d 1152, 1159.)

### III

The issue here is whether the NFL severance pay is in the *Skaden* category of deferred compensation for past services, or as Robert asserts, the *Flockhart-Wright-Kuzmiak* category of present compensation for loss of

earnings. The trial court stated: "In the instant case obviously the pay was for services previously rendered. He would be paid one amount if he was there for two years. . . . I think it was 10,000 for two years and if he remained eight years or more he would receive 100 or 110,000 so obviously the pay that he was to receive was to be based on past services rendered as distinguished from that portion of the collective bargaining agreement which provided for half a month's pay or whatever it is at the termination of employment."

We agree with the trial court's conclusion, but disagree with its reasoning that merely because the severance pay is tied to number of years of employment the pay is *obviously* for services previously rendered. In *Kuzmiak*, for example, the military separation pay was based on the number of years served, and yet the pay was found to be separate property. We must evaluate the character of the pay by looking at all relevant circumstances.

## IV

The severance pay here contains the following characteristics: (a) it is derived from a contract right; (b) it is based on the number of seasons worked; (c) it must be paid back to the NFL if the player returns to professional football within one year of receipt; (d) it will be paid back to him when he again leaves football, but no additional amount will have accrued for the seasons worked after his return; (e) it is given to the player's stated beneficiary or estate if he dies; (f) it is received in a lump sum after a certain period of time has passed following the player's notification to the club of his intent to permanently retire from professional football.

At a minimum, Robert will receive a lump sum of $100,000 severance pay based on his eight seasons with the NFL. During all eight seasons, he was married and was accruing the right to severance pay. He has earned an absolute right to the payment, which he will receive after he permanently leaves football.

There are no absolute rights to receive severance pay in the *Flockhart-Wright-Kuzmiak* line of cases or the disability cases.

In each of those cases, the payments are received *only if* a loss of work is forced upon an employee. None of those cases involve a contractual right to a payment, which arises after a certain number of years of employment and which will definitely be paid in the future.

In contrast, the NFL football player accrues the absolute right to severance pay. He will receive the severance pay even if he will also receive retirement

pay. The only requirement for the receipt of the severance pay is that he permanently leave football, voluntarily or involuntarily. If the player returns to professional football within 12 months and has to repay the severance pay, he will receive it back when he permanently retires.[6] The absolute nature of the player's right to the pay is illustrated by the testimony at the trial by the Union CBA negotiator that players have used the benefit as collateral for loans from financial institutions.

Based on these characteristics of the NFL severance pay, we conclude Robert's pay is a form of deferred compensation for services rendered, and thus community property.[7]

## V

■ At trial, Robert attempted to present the testimony of a Union negotiator that severance pay was designed to assist the player in the transition period after he leaves football.[8] The trial court disallowed the testimony on the basis of the parol evidence rule and irrelevancy.

We agree the testimony should have been admitted. ■ Under the parol evidence rule, "'[t]he test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, *but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.*'" (*Garcia* v. *Truck Ins. Exchange*

---

[6]The settlement agreement is silent as to whether the player can again accrue severance pay if he returns to football *after* 12 months have passed from the date of receipt of his severance pay. The CBA states: "A player may not qualify for more than one severance payment under this provision." In any event, the player has the absolute right to the receipt of severance pay at least once in his career.

[7]We note the spouse does not receive a windfall from obtaining her share of the severance pay after marital separation, even though if the player had continued playing football, she would not have had any community interest in money after marital separation. The player *never* loses his accrued right to severance pay, and will receive it when he permanently leaves football even if he continues playing football after marital separation. Thus, if the player continues playing after marital separation, he at most delays, but does not defeat, the spouse's receipt of her share of the severance pay.

[8]Robert made offers of proof the negotiator would have testified the purpose of the severance pay provision was to provide compensation for lost earnings after the player leaves the NFL, not to provide compensation for the time the player was a member of the NFL team; the amount of severance pay was pegged to the number of years played since the longer the player was in the NFL, the harder the transition to another career; the Union does not have a placement service to assist with the transition; players are increasingly required to spend a substantial amount of their off-season time performing services for the club, thus not able to develop other careers; retirement benefits are not designed to assist in the transition since they are paid many years after leaving the NFL; the severance pay has never been referred to nor intended as a bonus for work previously performed.

(1984) 36 Cal.3d 426, 435 [204 Cal.Rptr. 435, 682 P.2d 1100], italics added.)[9] Here, the trial court failed to evaluate whether the severance pay provisions were reasonably susceptible of being interpreted as designed to assist the player in the transition period after football, merely noting the agreements were not ambiguous. In fact, the provisions are reasonably susceptible of being interpreted as creating payments designed to assist the player during transition, and the testimony was relevant to assist the court in determining whether or not the payments were deferred compensation. However, we find the error harmless because admission of the testimony would not have resulted in a different outcome. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; *Textile* v. *Coleman* (1954) 122 Cal.App.2d 756, 760 [265 P.2d 571].)

Assuming the negotiator testimony would have established the severance pay was designed to assist the player in the transition period after he leaves football, this does not necessarily lead to the conclusion the pay was compensation for present loss of earnings rather than deferred compensation, for purposes of characterizing the property under community property law. Even were the pay designed to support the player after leaving football, the objective characteristics of the severance pay (i.e., the player has an absolute right to the pay which accrues during his seasons of employment, regardless of whether or not he is ever involuntarily forced to leave football) establish its character as deferred compensation for services previously rendered. Even retirement pay is designed to provide support to employees after their careers are ended and they are no longer earning money (*In re Marriage of Stenquist, supra,* 21 Cal.3d 779, 787); yet this factor does not result in a separate property characterization of retirement pay. Retirement benefits are considered community property because they are "not gratuities but deferred consideration for past services rendered" (*In re Marriage of Jones* (1975) 13 Cal.3d 457, 461 [119 Cal.Rptr. 108, 531 P.2d 420]).[10] In contrast,

---

[9]As noted in *Garcia* v. *Truck Ins. Exchange, supra,* 36 Cal.3d 426, 435, footnote 3, prior to the 1978 amendment of Code of Civil Procedure section 1856, California authority established the parol evidence rule did not apply to controversies in which a stranger to the contract was a party, such as this case. *Garcia* notes Witkin's suggestion that the 1978 amendment (which deletes language limiting the rule to disputes between contracting parties) changes the rule and applies the parol evidence rule even to actions involving third parties (Witkin, Cal. Evidence (1982 supp.) § 747, p. 309), but points out there is no judicial authority as to the effect of the amendment. *Garcia* did not resolve the issue, since the evidence was admissible in any event, which, as discussed below, is the same situation here.

[10]*Jones* was disapproved in *In re Marriage of Stenquist, supra,* 21 Cal.3d 779, 789, footnote 11, to the extent its language is inconsistent with *Stenquist's* holding that only the portion of a disability pension which is in excess of what the employee would have received as retirement pay if not disabled is separate property, and disapproved in *In re Marriage of Brown* (1976) 15 Cal.3d 838, 851 [126 Cal.Rptr. 633, 544 P.2d 561, 94 A.L.R.3d 164], to the extent its language is contrary to *Brown's* ruling that nonvested pension rights can constitute community property.

disability benefits are considered separate property because "[a]lthough longevity of service plays a role, the . . . right to disability payments, and the amount of the payments, depend primarily on the existence and extent of the disability." (*Id.*, at p. 462.)

Even though both retirement and disability payments are designed to support employees whose earnings have decreased or ended, they differ in that retirement payments are derived merely from a contractual right earned from previous services, whereas disability payments are derived from the employee's status of being a person who has lost some earning capacity.[11] If the employee is not deemed disabled so as to interfere with some of his ability to work, he has no right to disability payments; whereas an employee earns the absolute right to his retirement benefits merely because he has accrued the right during his employment.

Similarly, even though the NFL severance pay may be generally designed to support players in their transition after football, like retirement pay, it is pay that the player earns the absolute right to receive because of the seasons he has played regardless of whether he experiences any involuntary loss of earnings. Indeed, even if he dies before it is received and never experiences a transition period, his beneficiary or estate receives the pay. We conclude the severance pay is deferred compensation for services previously rendered and thus community property.

The judgment is affirmed.

Kremer, P. J., and Butler, J., concurred.

---

[11]In addition to compensating an employee for loss of earning capacity, disability payments are also to compensate for personal suffering caused by the disability. (*Stenquist, supra,* 21 Cal.3d 779, 787.) Workers' compensation benefits, however, which do not compensate for personal suffering, are nevertheless considered separate property when received after separation. (*In re Marriage of McDonald* (1975) 52 Cal.App.3d 509, 512-513 [125 Cal.Rptr. 160].)