[No. F014745. Fifth Dist. Aug. 26, 1993.]

KERN COUNTY WATER AGENCY, Plaintiff, Cross-defendant and Appellant, v.
BELRIDGE WATER STORAGE DISTRICT et al., Defendants, Cross-complainants and Appellants;
BERRENDA MESA WATER DISTRICT et al., Defendants, Cross-defendants and Respondents.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts I, II.B, II.C, and III of Discussion.

**COUNSEL**

John F. Stovall, Kronick, Moskovitz, Tiedemann & Girard, Lloyd Hinkelman, Edward J. Tiedemann and Laurie J. Sopwith for Plaintiff, Cross-defendant and Appellant.

Kuhs & Parker, Kuhs, Parker & Stanton, William C. Kuhs, McMurtrey & Hartsock, Gene R. McMurtrey and James A. Worth for Defendants, Cross-complainants and Appellants.

Crowe, Williams, Jordan, Richey & Brodersen, Daniel W. Crowe, George G. Logan, Bunker, Byrum & Kimball, Byrum, Holland & Griffin, Kenneth M. Byrum and Tommi R. Saghatelian for Defendants, Cross-defendants and Respondents.

## OPINION

**THAXTER, J.**—This action arose from a dispute among several water districts, all members of Kern County Water Agency (KCWA), over how certain costs charged to KCWA by the State of California Department of Water Resources (State) should be allocated among the member districts. Following a month-long nonjury trial, the court below issued a declaratory judgment generally favorable to two member districts. On review we conclude that the trial court did not err in its procedural and evidentiary rulings or in its interpretation of the relevant contractual provisions. We will affirm.

### FACTS AND PROCEDURAL BACKGROUND

KCWA is a political subdivision organized by legislative act and voter approval, mainly to contract with State for water from the State Water Project (Project) on behalf of its 14 member districts. On November 15, 1963, KCWA and State entered into a written agreement (the Master Contract) pursuant to which State agreed to make available to KCWA annual entitlements of water subject to payment and delivery under the terms of the contract. Between the period of 1966 and 1974, pursuant to its authority, KCWA entered into water supply contracts with each of its member districts: Belridge Water Storage District, Semitropic Water Storage District, Buena Vista Water Storage District, Wheeler Ridge-Maricopa Water Storage District, Rosedale-Rio Bravo Water Storage District, Kern Delta Water District, Henry Miller Water District, West Kern Water District, Berrenda Mesa Water District, Lost Hills Water District, Cawelo Water District, Tehachapi-Cummings County Water District,[1] Buttonwillow Improvement District of the Semitropic Water Storage District and Pond-Poso Improvement District of the Semitropic Water Storage District.[2] The water supply contracts are substantially identical and each expressly incorporated by reference the

[1]A default was entered against Tehachapi and it is not party to the appeal.

[2]The named defendants are referred to either by their abbreviated names or collectively as "member districts" unless they are being referred to with reference to their position in the appeal when they will be denominated as "appellants" or "respondents." Acting as "respondents" on appeal are the two member districts whose position the trial court adopted, Berrenda Mesa and Wheeler Ridge. KCWA and the remaining member districts are "appellants" in this opinion.

terms of the Master Contract[3] as amended by amendment 1 thereto, and "any revisions or amendments hereafter made which are approved by the Member Unit."

The Master Contract identifies several types of charges which appear in the State's bill to KCWA for the water supplied.

Article 22 provides for an annual charge designated as the "Delta Water Charge" which is designed to return to State all costs incurred in obtaining, conserving, and providing water for delivery through the California Aqueduct south of the Sacramento-San Joaquin Delta. This provision is not central to this dispute.

Article 23 creates an annual transportation charge which is designed to return to the State the costs of all Project transportation facilities necessary to deliver Project water to the contracting water agencies. These costs include a capital cost component, a minimum operation, maintenance, power and replacement component (OMP&R) and a variable OMP&R component. These components are defined and determined pursuant to articles 24, 25 and 26 of the Master Contract. For purposes of calculating these charges, the Project is divided into a series of "reaches," each constituting a length of the overall system. Pursuant to article 24, each contracting agency is required to pay a portion of these costs dependent on how many "reaches" are used to provide its water supply.

Article 25 provides that each contracting agency must pay a minimum portion of the transportation charges necessary to deliver water to the contracting agency regardless of the amount of water delivered and/or allocated to the agency. The amount is calculated based on the number of "reaches" used to deliver water to the agency, i.e., the geographical distance between the agency's delivery point and the Delta.

Article 26 defines those variable transportation costs which are billed to the contracting agency based on the water actually delivered and allocated to the contracting agency, the variable OMP&R costs. Unlike the other costs billed to KCWA, these costs are billed on a monthly basis.

The member water supply contracts specify how the member districts are to pay for the water. The language of the payment provisions in the various contracts is identical.

---

[3]Article 3 of the member water supply contract provides as follows: "This Contract is subject to the obligations and limitations imposed by the Master Contract and is intended to be in conformance and harmony with it. The Master Contract is hereby incorporated herein by this reference in all respects as though set forth in full at this point. The Member Unit hereby expressly agrees to the provisions of the Master Contract imposing obligations and limitations upon it and further expressly agrees that nothing in this contract shall be deemed to require the Agency to perform any obligation in conflict with the Master Contract."

The water is transported through the California Aqueduct to Kern County. Most of the member districts take their water through the Dos Amigos Pumping Plant where the aqueduct water is pumped to an elevation of 300 feet above sea level. Several of the member districts (Berrenda Mesa, Wheeler Ridge, West Kern and Tehachapi-Cummings), however, take all or part of their water through several incremental pumping plants which pump the water to higher elevations. Additional power is needed to operate these plants and to lift the water to the higher elevations. Generally, the cost of the additional power incurred through the incremental pumping plants is borne by the member district using the water and is billed each month as a variable OMP&R cost.

The cost of transporting the water to the Dos Amigos Pumping Plant is charged to the member district in the minimum OMP&R component and divided among the member districts by use of a multiplier. The multiplier is derived from several factors, the most significant being the amount of the member district's entitlement to water coming through the Dos Amigos Pumping Plant.

In the late 1970's and early 1980's, State investigated nontraditional power sources to supplement the Project's own power-generating capacity. The Project itself generates 65 percent of the power needed to transport the water south to the various users. State built two "off-aqueduct" geothermal plants, Bottle Rock and South Geysers. Neither plant produced the power anticipated and both are considered "white elephants" by all involved. South Geysers is "mothballed" and is producing no power. A third off-aqueduct power source was obtained through the purchase of an interest in the Reid Gardner coal-generated power plant in Nevada. The Reid Gardner purchase has also not been as advantageous as anticipated—power can be purchased for less then the cost of bringing the power from Reid Gardner to California.

It was necessary for State to recoup the costs of these off-aqueduct power sources, primarily by passing the costs on to the contracting water agencies. State had expended money to build the two geothermal plants and to purchase the interest in Reid Gardner. These capital costs were primarily funded through revenue bonds. In addition, there are fixed maintenance and operational costs associated with the operation of these three plants. Lastly, there are the actual costs of supplying power to deliver the water.

State initially proposed that these costs be billed to the water contractors as capital costs. Under article 28 of the Master Contract this would have a retroactive and prospectively detrimental effect on the Project interest rate

adjustments which were being charged to the contracting agencies. The water contractors objected and a lengthy negotiation process began. KCWA was the primary negotiator representing the interests of its member districts, although several of the districts participated directly in negotiations. The engineers/managers for Wheeler Ridge, Berrenda Mesa, Henry Miller and Belridge all attended the negotiation sessions regularly and other districts may have been directly represented on occasion.

Several proposals were exchanged. Various billing formulas were suggested, including billing the costs strictly as variable OMP&R transportation costs. Normally, power costs are billed in this category as costs dependent on the amount of water used. State wanted to ensure adequate income to service the bond holders even when no water was delivered and rejected these proposals. As a compromise, the negotiators looked at placing the off-aqueduct costs in the minimum OMP&R component of the transportation charge of article 25. During negotiations, no one discussed how the various proposals would impact the member districts.

The final agreement was to adopt the compromise and bill the off-aqueduct costs under the minimum OMP&R component. Under the minimum OMP&R component, the costs are allocated among the contracting agencies by a proportionate use of facilities method, with each agency paying a consistent amount of the total cost to State based on the percentage of the agency's entitlement and the agency's distance from the Delta. Placing the costs in the minimum OMP&R component ordinarily means subjecting it to the multiplier found in the member district water supply contracts.

The agreement reached was memorialized in amendment 17 to the Master Contract. Amendment 17 was executed by KCWA and ratified by its board of directors. KCWA and its member districts received a significant financial benefit from amendment 17 because it moved State from its initial position of billing the off-aqueduct costs as capital costs rather than as minimum transportation costs. State bills KCWA for off-aqueduct costs on the minimum OMP&R component of the transportation charge billed under article 25 of the Master Contract.

The Master Contract has been amended 20 times since the initial contract was executed in 1963. The amendments range from simple modification in terminology or changed entitlements (amendments 1, 2, 7, 16) to more complex changes in obligations between the parties (amendments 3, 8, 11, 17). Some of the amendments are the result of lengthy negotiations lasting

several years. Pursuant to article 1(h) of the water supply contracts, amendments to the Master Contract affect the member districts' contractual benefits and obligations under the water supply contracts.

KCWA undertakes the amendment process in the same way each time an amendment to the Master Contract has been required. Despite the "approval" language of the water supply contracts, generally no express approval, written or oral, has ever been obtained from member districts for any of the 20 amendments to the Master Contract. When amendment 13 was negotiated, a corresponding amendment to Semitropic Water District's water supply contract was obtained. When amendment 7 was negotiated, there may have been a corresponding change to some of the water supply contracts.

It is the policy of KCWA to initiate the amendment process either by suggesting the amendment or responding to suggested amendments and to conduct negotiations with State on behalf of the member districts. The member districts are informed of the proposals received or suggested, the progress of negotiations, and any final agreements. The member districts are invited to participate in negotiations and all records and meetings of KCWA are public. No member district has ever objected to the procedure or claimed any of the amendments, other than amendment 17, are not binding on them.[4]

The same procedure was followed with respect to amendment 17. The member districts were notified of State's initial proposal and position with respect to off-aqueduct costs. Member districts were invited to participate in negotiations, comment on the various proposals, and were informed by way of agenda notice when the matter would be discussed by KCWA's directors.

When the final compromise was reached, the draft amendment was sent to the member districts with explanation for review and comment. The notice of meeting and agenda for the October 28, 1982, KCWA board meeting notified the member districts the issue was on the agenda and a final draft would be considered. After amendment 17 was finally adopted by KCWA's board, member districts were told an executed copy of the amendment was on file. KCWA received many inquiries from the member districts about amendment 17, but none relevant to the way the off-aqueduct costs would be billed.

In 1983, 1984, and 1985, the off-aqueduct costs were billed to KCWA and to the member districts in accordance with the literal terms of amendment

---

[4]With the exception of amendment 17, KCWA takes the position that the amendments thus far are "cost neutral." However, KCWA admits, and the language of the amendments themselves suggests, member districts' benefits and obligations under the Master Contract and under their own water supply contracts have changed as a result of the amendment process.

17—under the minimum OMP&R component of the transportation charges and therefore subject to the multiplier. KCWA took a close look at how these costs were being billed and concluded billing them through the multiplier, pursuant to article 25, amendment 17 and article 15(1) of the member supply contracts as a minimum OMP&R cost was inconsistent with the KCWA's pricing policies. KCWA had, over the course of the Master Contract, generally taken a "cost for services" approach to pricing.

KCWA essentially concluded there were two ways to bill the off-aqueduct costs: 1) to bill the costs under article 25, i.e., as minimum OMP&R costs, pursuant to a literal interpretation of amendment 17; or 2) to allot the costs among the member districts in direct proportion to the power used in a manner consistent with KCWA's pricing policies, even though they appeared in the State bill as a minimum OMP&R component. Under the second approach, Berrenda Mesa and Wheeler Ridge would pay the bulk of the off-aqueduct power costs since they take most of their water from the incremental pumping stations. The off-aqueduct costs required to bring water to Dos Amigos Pumping Plant, i.e., to the Kern County line, would remain in the multiplier.

On April 3, 1985, KCWA sent a memo to all member districts outlining the problem and explaining how KCWA was currently billing the member districts. The memo outlined the conflict between the two approaches to billing for off-aqueduct costs and informed the member districts that because of the contract language those costs were being billed as part of the minimum OMP&R charge. Until that date, none of the member districts had complained about KCWA's billing practices. Thereafter, however, most of the member districts objected to billing the off-aqueduct costs as a component of the minimum OMP&R charge.

After receiving the objections, KCWA tried to negotiate a compromise resolution among the member districts. After it became clear this was not possible, KCWA began to compute the off-aqueduct costs as both a minimum and variable OMP&R component and required the member districts to pay whichever was higher. The excess funds received by KCWA from this billing practice were kept in an escrow account pending resolution of the dispute.

KCWA thereafter filed a declaratory relief action to resolve the matter. All member districts except Tehachapi answered. There were numerous cross-complaints filed by member districts which raised additional issues not pertinent to this appeal. One of the issues was a claim for damages by

Berrenda Mesa and Wheeler Ridge for reimbursement of amounts they claimed to have overpaid KCWA for their share of off-aqueduct costs. Pursuant to stipulation, trial on these issues was bifurcated from trial on the declaratory relief issues. The bifurcated issues were ultimately settled by the parties.

Following trial on the declaratory relief issues, the court rendered a tentative decision in favor of Berrenda Mesa and Wheeler Ridge. In its statement of decision the court found that the member districts approved amendment 17 to the Master Contract by acquiescing in KCWA's execution of the amendment after having been given sufficient notice of its provisions without making any objection thereto, and the amendment was therefore incorporated into each of the member district water supply contracts. The court also found that the payment provisions relating to off-aqueduct costs were clear and unambiguous and required the member districts to pay for those costs as part of the minimum OMP&R component, rather than as a variable power cost. The court sustained an objection initially made by Berrenda Mesa and Wheeler Ridge, and later joined by KCWA, to extrinsic evidence offered by appellants to show an intention that the off-aqueduct costs be charged as a variable power cost and struck all such extrinsic evidence.

After entry of an interlocutory judgment, but before trial on the bifurcated issues, several of the member districts, joined by KCWA, moved for leave to amend their cross-complaints to assert additional damage claims. The motion was denied. When the damage issues were resolved by stipulation, final judgment was entered. Each of the member districts, save Berrenda Mesa, Wheeler Ridge, and Tehachapi, filed timely notices of appeal. KCWA filed its own appeal.[5]

DISCUSSION

I. *"Approval" of Amendment 17**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II. *Exclusion of Extrinsic Evidence*

After provisionally allowing extrinsic evidence as to the parties' intent, expressed and unexpressed, with respect to amendment 17, at the end of trial

---

[5] In its complaint and throughout trial KCWA claimed neutrality. On appeal, however, KCWA informs us that its board of directors disagrees with the trial court's interpretation of the payment provisions relating to off-aqueduct costs. KCWA's appeal seeks, in case we reverse the declaratory judgment, recovery of the funds paid by KCWA to Berrenda Mesa and Wheeler Ridge pursuant to the trial court's interpretation of the contract payment provisions. Because we will affirm, we need not consider the appeal of KCWA.

*See footnote, *ante*, page 77.

the trial court struck the evidence, citing the parol evidence rule. The trial court concluded the payment provisions of the respective member district water supply contracts and the language of amendment 17 are "clear, unambiguous and precise" and therefore extrinsic evidence as to the meaning of amendment 17 was inadmissible. Appellants attack the court's ruling on three fronts. First, they contend respondents have no standing to raise the parol evidence rule because they are not party to the agreement between KCWA and other member districts. They then argue the court erred, under the facts of this case, to apply the parol evidence rule by excluding evidence of intent. Finally, appellants argue KCWA should be estopped from raising the objection because KCWA failed to raise it early in the litigation.

### A. *Standing*

■ Prior to 1978, Code of Civil Procedure section 1856 included language which limited application of the parol evidence rule to parties, their representatives, and/or successors in interest. Case law interpreted this language as making the parol evidence rule inapplicable in actions involving a stranger to the contract. (See 2 Witkin, Cal. Evidence (3d ed. 1986) Documentary Evidence, §§ 1011-1012, pp. 954-955.) In 1978, the statute was substantially amended by, among other changes, deleting the limitation language. Three cases have noted Witkin's conclusion that the amendment eliminates the limitation but did not decide the issue. (See *Garcia* v. *Truck Ins. Exchange* (1984) 36 Cal.3d 426, 435, fn. 3 [204 Cal.Rptr. 435, 682 P.2d 1100]; *In re Marriage of Horn* (1986) 181 Cal.App.3d 540, 549, fn. 9 [226 Cal.Rptr. 666]; *General Motors Corp.* v. *Superior Court* (1993) 12 Cal.App.4th 435, 441, fn. 1 [15 Cal.Rptr.2d 622].)

We adopt Witkin's interpretation of the statutory amendment. ■ When a statute is amended to delete an express provision, the presumption is that the Legislature intended to change the law. (*Subsequent Injuries Fund* v. *Industrial Acc. Com.* (1963) 59 Cal.2d 842, 844 [31 Cal.Rptr. 477, 382 P.2d 597]; *Jordan* v. *Consolidated Mut. Ins. Co.* (1976) 59 Cal.App.3d 26, 48 [130 Cal.Rptr. 446].) ■ As Witkin notes, prior to the amendment the commentators severely criticized the practice in California of allowing extrinsic evidence to impeach a written agreement when one of the parties to the action was a stranger to the contract. (See 9 Wigmore, Evidence (Chadbourn rev. 1981) § 2446; 3 Corbin, Contracts (1960) § 596.) The deletion was substantive and not merely an oversight. (See *Review of Selected 1978 California Legislation* (1979) 10 Pacific L.J. 275.) One can only conclude that by eliminating the limitation language, the Legislature intended to eliminate the limitation.

■ The facts of this case strongly support the power of any member district to invoke the parol evidence rule. All of the member districts are parties to the Master Contract and amendment 17, which are incorporated by reference into all the water supply contracts. The water supply contracts are substantially identical and expressly recognize the interrelationship of the contracts between the member districts and KCWA. Article 6 of the water supply contracts mandates that KCWA consider its agreements with the other member districts when making annual water allocations. There are notice requirements to the contracting member unit and *all other* member districts. Article 8 of the water supply contracts provides that the contracting member district and *all other member districts* shall have the right to inspect measuring devices installed by KCWA.

Clearly each member district has an interest in the contracts between other member districts and KCWA. The trial court could not interpret one member district's contract without affecting the contractual rights and obligations of all parties. The overlapping interests of the various districts in the others' contracts is sufficient basis for allowing each to rely on the parol evidence rule when the court is asked to interpret provisions in any of the contracts. (See Civ. Code, § 1642.)

B.-C.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

III. *Refusal to Allow Amendment of Cross-complaints**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

Judgment affirmed. Costs to respondents.

Martin, Acting P. J., and Dibiaso, J., concurred.

A petition for a rehearing was denied September 22, 1993.

---

*See footnote, *ante*, page 77.