Filed 9/19/16  Jibe Audio v. Beats Electronics CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JIBE AUDIO LLC et al.,<br><br>    Cross-complainants and<br>    Appellants,<br><br>    v.<br><br>BEATS ELECTRONICS, LLC, et al.,<br><br>    Cross-defendants and<br>    Respondents. | B267633<br><br>(Los Angeles County<br>Super. Ct. No. BC533089) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Malcolm H. Mackey, Judge.  Reversed and remanded.

Susman Godfrey, Stephen E. Morrissey, Brian Melton, Davida Brook, and Ravi Doshi for Cross-complainants and Appellants.

Morrison & Foerster, Miriam A. Vogel, David M. Walsh, Stephanie L. Fong, and Kai Bartolomeo for Cross-defendants and Respondents Beats Electronics, LLC, Andre Young and Jimmy Iovine.

Coblentz Patch Duffy & Bass, Clifford E. Yin, Bejan D. Fanibanda and Alice H. Wang for Cross-defendants and Respondents Ammunition, LLC, and Robert Brunner.

_____

Appellants Jibe Audio LLC (Jibe) and Steven Lamar (Lamar) (collectively, Lamar) appeal from a final judgment entered after the trial court granted summary judgment in favor of respondents Beats Electronics, LLC (Beats), Andre Young (Dre),[1] Jimmy Iovine (Iovine), Ammunition, LLC (Ammunition), and Robert Brunner (Brunner) on Lamar's cross-complaint against these parties.[2] Lamar alleged generally that under a settlement agreement, he was owed royalties on the sales of certain headphone models embodying an original headphones design.

In his cross-complaint, Lamar alleged the following causes of action against Beats, Dre, and Iovine (collectively, the Beats parties): breach of contract, breach of the implied covenant of good faith and fair dealing, and bad faith denial of contract. Lamar also sought declaratory relief regarding his rights to royalty payments on certain headphone models, as well as an accounting to determine the royalty amounts owed.

Lamar alleged the following causes of action against Ammunition and Brunner (collectively, Brunner): breach of fiduciary duties, intentional interference with contractual relations, negligent interference with contractual relations, intentional interference with a prospective economic advantage, and negligent interference with a prospective economic advantage.

The trial court granted summary judgment to Brunner and the Beats parties on the ground that the written settlement agreement at issue only required royalty payments on the first headphone model, the Studio model, as a matter of law.

Because we find that the contract is ambiguous and disputes of material fact exist, we reverse the summary judgment and remand the case for trial.

---

[1]     Andre Young is professionally known as "Dr. Dre"

[2]     Pentagram Design, Inc., and its successor-in-interest, Hinrichs and Associates, were also named defendants in Lamar's cross-complaint. They are not parties to this appeal.

## FACTUAL BACKGROUND

**The relationship between the parties and the development of the Beats headphone idea**

The parties present different stories as to how their relationship began. Lamar alleges that in January 2006, he met with Iovine to pitch his idea of building a celebrity-endorsed, high-end headphone line.[3] Iovine immediately expressed interest in the project, and proposed Dre as the venture's celebrity-endorsement partner. The Beats parties, on the other hand, allege that they decided to embark on the headphone project before meeting with Lamar. The Beats parties characterize the Beats headphones as "the brainchild" of Iovine and Dre.

The parties agree that it was Lamar who brought Brunner, a renowned industrial designer, and his then-firm Pentagram, into the business relationship. Lamar alleges that he met with Brunner to further develop the headphones design and brand. Lamar alleges that he and Brunner collaborated closely on Lamar's vision, and their work resulted in the creation of the iconic product design concept (the headphones design) that defines the "Beats by Dr. Dre" headphone line.

The Beats parties, on the other hand, claim that the first Beats headphone, the Studio model, was developed exclusively by Iovine, Dre, and Brunner.

In February 2006, Iovine and Dre met with Lamar and Brunner to discuss various design concepts, and ultimately decided on the headphones design which was depicted on slides 49-50 of Lamar's presentation. Lamar alleged that he agreed to provide certain financing and technology for the project.

In April 2006, Lamar alleges, he made a follow-up presentation of the Beats business plan, discussing an initial product line of three Beats headphone models based on the Beats design: a noise-cancelling model, a non-noise-cancelling model, and a

---

[3] At the time of this initial meeting, Lamar was president of SLS International (SLS), an audio technology company. Lamar later formed a new company, Jibe, to support the headphone venture.

Bluetooth wireless model. By June 2006, Brunner failed to obtain design patent protection for the Beats design. The design patent was eventually granted on October 2, 2007, as U.S. Patent No. D552,077 S (the 077 Patent).

Lamar initially intended for the Beats project to be financed by SLS, but around March 2006, doubts arose about the ability of SLS to finance the project. Lamar formed Jibe for the purpose of supporting the venture. Lamar alleges that the business plan remained the same.

**The 2006 lawsuit and 2007 settlement**

Lamar states that in May 2006, Iovine and Dre made it clear that they did not want to invest their own money in the venture. Thus, Lamar began to look for other investors. This prompted a rift in the relationship, and in July 2006 Iovine and Dre filed suit against Lamar, Pentagram, Jibe and SLS for alleged breach of oral contract concerning the manufacture, marketing, and distribution of the Beats headphone line. Iovine and Dre alleged:

> "This action arises from Defendants' breach of an oral contract for Defendants to manufacture, market, and distribute a line of headphones designed by Plaintiffs under the trademark 'Beats'. . . Plaintiffs herein seek damages for breach of contract and for declaratory and injunctive relief, including for a declaration that Plaintiffs are the sole owner of the 'Beats' design and trademark for an order precluding Defendants from using the 'Beats' design or trademark for any purpose."

The parties ultimately negotiated a settlement of the 2006 lawsuit. Brunner was a primary negotiator of the deal, and promised Lamar that he would resolve the dispute fairly to Lamar and would not accept any deal without Lamar's input and agreement. Lamar alleges that it was the parties' understanding throughout the negotiations that Lamar, Jibe, and Pentagram would receive royalties of some amount on sales of any headphone products developed from the Beats design. Lamar produced evidence that Brunner stated to Iovine's representative, Berman, that any settlement would require payment "on the product and its iterations." Brunner proposed that royalties could be paid to Pentagram as an intermediary and then onward to Lamar. Lamar contends that it

4

was always contemplated that the Beats design would lead to a line of products, including a smaller, non-noise-cancelling version of the first headphone product based on the Beats design.

On April 24, 2007, the parties resolved the dispute and contemporaneously executed three related contracts which were part of a global settlement of the 2006 action.

### *The Global Settlement Agreement*

The Global Settlement Agreement (GSA) is signed by each of the parties to the 2006 action:  Iovine, Dre, Pentagram, SLS, Jibe, and Lamar.  The agreement recites:

> "Pentagram, Lamar, SLS, Jibe, [Iovine] and/or Dre designed certain headphones as depicted on Schedule I to the Royalty Agreement attached as Exhibit A to this Settlement Agreement ('Headphones Design') to be marketed and sold under certain names and trademarks including, but not limited to, 'Beats by Dr. Dre'. . . ."

The GSA obligates Lamar, Jibe, and Pentagram to relinquish their rights to use and ownership of the headphones design to Iovine and Dre.  In exchange, Iovine and Dre are obligated to pay royalties on covered headphones to Pentagram.[4]

The GSA explicitly acknowledges that a royalty agreement will be "effective and executed concurrently with the execution of this Agreement, in the form set forth as Exhibit A to this Agreement."

### *Exhibit A to the GSA:  the Royalty Agreement*

The manner in which the royalty payments should be made, and how the headphones design is covered by the royalty obligation, is delineated in exhibit A to the GSA, the Royalty Agreement.  The parties to the Royalty Agreement are Iovine, Dre, and Pentagram.

The Royalty Agreement provides that it is entered into pursuant to the GSA.  It further provides that Iovine and Dre intend to enter into an agreement with Monster Cable for the manufacture, marketing and sale of "Headphones (as defined below)."  The

---

[4]    The Lamar-Pentagram agreement, described below, obligated Pentagram to then pay half of these royalties to Lamar and Jibe.

agreement states that Iovine and Dre "will pay a royalty to Pentagram on revenue generated by sales of Headphones."

The term "Headphone" is defined in the following paragraph:

> "Four percent (4%) of the Base Price ('Base Royalty') of every Headphone sold by Monster and its Affiliates through dealer/distributor sales channels, as reduced by returns and discounts and other reductions pursuant to the terms of the Merchandising Agreement ('Normal Dealer Sales'). The term 'Base Price' means the royalty base price applicable to the royalty payable to [Iovine] and Dre under the Merchandising Agreement. The term 'Headphone' means a headphone that only embodies the Headphones Design depicted in Schedule I hereto, and any minor or cosmetic modifications in the design specifically identified on Schedule I hereto."

The agreement further provides: "The only headphones or other products that are subject to the Base Royalty and the Supplemental Royalty are the Headphones."

Schedule I contains 14 design drawings of two distinct versions of the Beats design. One of these versions is in Figures 1-7 and the second is in Figures 8-14. Lamar alleges that both designs share what is immediately recognizable as the common design that characterizes the Beats headphones to this day. Lamar has also provided evidence that these 14 design drawings are Figures 1-14 of the 077 Patent, which Brunner applied for in 2006 to protect the Beats design.

The Royalty Agreement provides:

> "This Royalty Agreement and the [GSA] set forth the entire understanding and agreement of the Parties with regard to the subject matter of this Royalty Agreement, and supersede all prior and contemporaneous agreements and understandings (not including the [GSA]), both oral and written."

Lamar alleges that he understood the Royalty Agreement to be part and parcel of the GSA, and the parties all agree that Lamar is a beneficiary of its royalty obligation even though he was not a signatory to the Royalty Agreement.

6

*The Lamar-Pentagram Agreement*

The Lamar-Pentagram Agreement was signed by Lamar, Jibe, and Pentagram, and obligates Pentagram to pay half of the royalties it receives from Iovine and Dre (the main royalty) to Lamar and Jibe. The Lamar-Pentagram Agreement begins by acknowledging that the parties have entered the GSA with Iovine and Dre and that "[a]s part of the Global Settlement, [Iovine] and Dre have agreed to pay Pentagram a 4% royalty on the sales of Headphones . . . ('Main Royalty')."

The agreement further provides that "[t]o compensate for any contributions that Jibe and Lamar may have made to the design of the Headphones, Pentagram will pay to Jibe one-half of the Main Royalty payments actually received by Pentagram from [Iovine]/Dre ('Royalty Share')." Pentagram "shall not waive or impair (through inadvertence or otherwise) any right to receive Main Royalty payments from [Iovine]/Dre, or to receive them in a timely manner."

The Lamar-Pentagram Agreement specifically integrates the Royalty Agreement, stating: "This Agreement and the Royalty Agreement set forth the entire understanding and agreement of the parties with regard to the subject matter of this Agreement . . . ."

**Events subsequent to the 2007 settlement**

Since the 2007 settlement, Beats has released 10 headphone models: The Studio, Solo, Wireless, Studio Remastered, Studio Remastered Wireless, Solo2, Solo2 Wireless, Pro, Executive, and Mixr Models. It is Lamar's position that all 10 models embody the headphones design. In particular, the first three of these 10 models, the Studio, Solo, and Wireless, correspond exactly to the three headphone models presented by Lamar in his July 2006 PowerPoint presentation: a noise-cancelling model (Studio); a non-noise-cancelling model (Solo); and a Bluetooth wireless model (Wireless).

In 2008, after Beats released the original Studio, its first headphone model, it began paying a royalty on its sales of that product pursuant to the Royalty Agreement. Brunner, who had since left Pentagram to start a new design firm, Ammunition, assumed the responsibility of monitoring the incoming royalty payments because he had "the most

7

sense of [their] validity." Lamar alleges that Brunner represented to Lamar that he would uphold Lamar's trust in monitoring the payments and investigating payment shortages.

In late 2009, Beats released the Solo, a more compact, non-noise-cancelling model. On May 12, 2010, Lamar received a royalty statement summary describing the allocation that would be paid to him for the previous quarter's Studio model sales. The statement did not reflect any payments for the Solo model.

Lamar e-mailed Brunner to inquire as to whether they were receiving the required royalty payments. Lamar asked, "Doesn't our agreement call for royalty payments on derivative products? . . . like the 'solo' product and coming 'pro' product . . . clearly a derivative of the Studio product, aren't they?" On May 20, 2010, Brunner responded: "Absolutely not. Those are ground up products designed by me here at Ammunition . . . The [*sic*] carry some beats DNA of course, but to think any product with the Beats design language comes under the Pentagram agreement is not correct." However, Brunner acknowledged that other Beats headphones based on the original headphones design would be covered by the 2007 agreement, including "a blue tooth version" and "changes to the Studio platform." Based on Brunner's e-mail, Lamar claims he did not understand Brunner to mean that he would not be paid royalties on future Beats products, just that it was Brunner's position that the Solo was not subject to the royalty obligation. Lamar disagreed with Brunner's position, as the Solo headphone was the very non-noise-cancelling headphone that he had presented in his 2006 PowerPoint presentations, and Lamar believed it embodied the headphones design.

In 2011, Beats released its Wireless headphone, the very "blue tooth version" of the headphones design that the parties had previously contemplated and which Brunner had acknowledged would be covered by the Royalty Agreement. However, Lamar was not paid royalties on this product. In late 2011 and early 2012, the Executive and Mixr models were released, and royalties were similarly not paid.

In August 2013, Beats released its second-generation version of the Studio headphone, the Studio Remastered. When Lamar was not paid royalties on this product, he inquired about the nonpayment and learned for the first time that Brunner and Beats

8

now claimed that even this second-generation Studio headphone was not subject to the royalty obligation.

Beats refused to acknowledge that any of its headphones were based on the original headphones design. However, Lamar produced evidence that in marketing these headphones to the public, Beats specifically advertised them as embodying that headphones design. For example, in a promotional video, Brunner stated that in creating the Wireless model, he and Beats "really wanted to build it out of the classic Beats DNA, which is very much about the original Studio headphone, and then the Solo headphone." Beats has also admitted that the 077 Patent protects not only the original Studio headphone but the subsequent headphone models. As explained above, the drawings supporting the 077 Patent form Schedule I of the Royalty Agreement.

**Brunner's separate agreements with Beats**

Lamar alleges that Brunner's insistence that the subsequent Beats headphone models are not covered by the Royalty Agreement is motivated by self-interest. In 2009, Brunner entered into a separate agreement with Beats (through Monster) that increased his royalty share of Solo sales from 0.8 percent under the Royalty Agreement to 2 percent under the new agreement. At the same time, Beats was able to decrease its royalty payout from 4 percent under the Royalty Agreement, which would have included payments to Lamar, Brunner, and Brunner's former associates, to just 2 percent, all of which went directly to Brunner.

Similarly, in 2012, Brunner and Beats entered into a follow-up agreement, maintaining the 2 percent royalty payment to Brunner but covering more headphone models, including the Wireless and Remastered.

Brunner and Beats insisted to Lamar that all the Beats non-Studio models did not embody the headphones design and were not covered by the Royalty Agreement. As a result, Brunner collected royalties on sales of non-Studio Beats headphones, while Lamar received royalties only on the Studio model.

9

In spring 2014, Beats and Brunner entered into an agreement in which Beats bought out Brunner's interest in future headphone sales covered by the Beats/Brunner side agreements for $32 million.

## PROCEDURAL HISTORY

**The complaint for declaratory relief and Lamar's cross-complaint**

In January 2014, Lamar's counsel sent a demand letter to Pentagram and Hinrichs, claiming that Beats was breaching the royalty agreement by paying royalties for only the Studio model, and that Pentagram had an obligation to Lamar to audit and monitor the royalties and file a lawsuit if necessary.

Prompted by the demand letter, on January 13, 2014, Hinrichs and Pentagram sued Beats, Dre, Iovine, Lamar, and Jibe for declaratory relief. Hinrichs and Pentagram sought a declaration of the rights and liabilities of the parties, and whether Beats had paid, and continues to pay, all royalties under the Royalty Agreement. Hinrichs and Pentagram further sought declarations that they had no obligations to Lamar and Jibe under the Pentagram-Lamar Agreement, and no obligation to audit or otherwise monitor the royalty payments.

Lamar filed his cross-complaint on May 16, 2014, alleging breach of contract-related causes of action against Beats, Iovine, and Dre, and breach of fiduciary duty and tortious interference causes of action against Brunner. Lamar claimed he was owed royalties for the nine headphone models for which he had not received royalties: the Solo, Wireless, Pro, Executive, Mixr, Studio Remastered, Studio Wireless, Solo2, and Solo2 Wireless models.

**The summary judgment motions**

On March 27, 2015, the Beats parties and Brunner separately moved for summary judgment.

The Beats parties argued that they were entitled to summary judgment because (1) Lamar is not a party to the Royalty Agreement, nor is he a beneficiary to that agreement,

therefore, he could not recover from Beats for any breach of that agreement;[5] and (2) the scope of the Royalty Agreement covered only one product -- the Studio headphone. [6]

Brunner argued that he was entitled to summary judgment on Lamar's claims against him because the breach of fiduciary duty and tortious interference claims were barred by the applicable statutes of limitation.

The motions were heard on June 10, 2015. With respect to the Beats parties' motion, the trial court held that "the Royalty Agreement covers only one product, the first headphone model, Studio." In doing so, the court considered extrinsic evidence in the form of declarations from the signatories to the Royalty Agreement: Iovine, Dre, and Brunner, indicating that the Royalty Agreement was meant to cover only a single headphone model -- the Studio model -- which Iovine, Dre, and Brunner were working on at the time of the agreement. Iovine and Dre declared that at the time they signed the agreement, they had no idea if that headphone would be successful or if there would be other headphones. Brunner declared that it was his understanding that the Royalty Agreement covered only the "Studio" model. The court also admitted and presumably considered contradictory evidence submitted by Lamar that the Royalty Agreement was intended to require royalties on other headphone models embodying the headphones design.

Based on its decision that the Royalty Agreement extended only to the first headphone model, the Studio model, the trial court also granted summary judgment in favor of Brunner. In so doing, the trial court explicitly declined, in spite of Brunner's request, to determine whether Lamar's claims against him were time-barred.

---

[5] In its reply brief on summary judgment, Beats conceded for the purposes of that motion that Lamar was a third party beneficiary of the Royalty Agreement.

[6] Beats moved for summary judgment or, in the alternative, summary adjudication, only to the extent that Lamar's claims involved any Beats headphone other than the original Studio headphone.

11

**Post summary judgment proceedings**

On June 24, 2015, Lamar filed a motion for reconsideration, which the trial court denied on August 3, 2015. The trial court found that Lamar had presented no new facts, circumstances or law that could not with reasonable diligence have been presented in the original motion, and that based on the previous evidence, no erroneous ruling had occurred.

Lamar also sought a writ of mandate on July 6, 2015, which was denied on August 11, 2015, on the ground that Lamar had an adequate remedy by way of appeal from the final judgment.

On August 18, 2015, the trial court entered judgment for Brunner.

Only Lamar's claims against Beats relating to the Studio headphones remained, and those claims were resolved out of court. On November 4, 2015, having already granted summary adjudication on the bulk of Lamar's claims, and having dismissed Lamar's remaining claims by request, the trial court entered judgment for the Beats parties.

Lamar filed timely notices of appeal on October 15, 2015, as to Brunner, and November 16, 2015, as to the Beats parties.

## DISCUSSION

### I. Standard of review

We review a grant of summary judgment de novo, deciding independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law. (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 253.) The appellate court's task is to make "'an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court . . . .' [Citations.]" (*Brundage v. Hahn* (1997) 57 Cal.App.4th 228, 234-235.) Thus, we must determine "whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law. [Citations.]" (*Iverson v. Muroc Unified School Dist.* (1995) 32 Cal.App.4th 218, 222.)

12

In conducting the de novo review, we must consider all of the evidence and all of the inferences reasonably drawn therefrom, and must view such evidence and such inferences, in the light most favorable to the opposing party. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.) Summary judgment is appropriate only where the undisputed evidence entitles the moving party to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)

## II. Rules of contract interpretation

We begin with a review of general principles of contract interpretation. "'The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the "mutual intention" of the parties. "Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (*Id.*, § 1639.) The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage,' (*id.*, § 1644), controls judicial interpretation. (*Id.*, § 1638)." [Citations.] . . .' [Citation.]" (*MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 647.) A contract will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable. (*Ibid.*)

"The interpretation of a contract involves 'a two-step process: "First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine 'ambiguity,' i.e., whether the language is 'reasonably susceptible' to the interpretation urged by a party. If in light of the extrinsic evidence the court decides the language is 'reasonably susceptible' to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step -- interpreting the contract. [Citation.]" [Citation.] The trial court's determination of whether an ambiguity exists is a question of law, subject to independent review on appeal. . . . [Citation.]'" (*Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1351, fn. omitted.)

13

Where such extrinsic evidence is in conflict, the resolution of that conflict is a question of fact. "'"[W]hen two equally plausible interpretations of the language of a contract may be made . . . parol evidence is admissible to aid in interpreting the agreement, thereby presenting a question of fact which precludes summary judgment if the evidence is contradictory." [Citation.]'" (*Wolf v. Superior Court*, *supra*, 114 Cal.App.4th at p. 1351, fn. omitted.) Thus, where there is no material conflict in the extrinsic evidence, the trial court may interpret the contract as a matter of law. (*Lonely Maiden Productions, LLC v. GoldenTree Asset Management LP* (2011) 201 Cal.App.4th 368, 376-377.) "'If, however, there is a conflict in the extrinsic evidence, the factual conflict is to be resolved by the jury. [Citations.]'" (*Ibid.*)

### III. The Royalty Agreement and the parties' conflicting interpretations

The parties here urge conflicting interpretations of the Royalty Agreement, which is included as exhibit A to the GSA. The Beats parties and Brunner contend that the Royalty Agreement was only intended to cover one product: the Studio headphone. They argue that the agreement was not intended to cover sales of the entire line of Beats headphones.

Lamar, on the other hand, argues that the Royalty Agreement requires Beats to pay a royalty on the sale of every headphone whose design embodies or is a minor or cosmetic modification to the original headphones design.

Neither party points out specific language within the contract that it considers to be ambiguous. In fact, each of the parties on both sides of the debate urge that the plain language of the contract supports its interpretation.

The relevant contract provisions are as follows. In the opening "Recitals," the Agreement provides:

> "D. In consideration of Pentagram's assignment to [Iovine] and Dre of Pentagram's Assigned Rights acquired in the course of providing the Services, [Iovine] and Dre will pay a royalty to Pentagram on revenue generated by sales of Headphones."

14

Under "Terms and Conditions," the Agreement provides that "[Iovine] and Dre will pay to Pentagram the following royalty payments:"

"b) Four percent (4%) of the Base Price ('Base Royalty') of every Headphone sold by Monster and its Affiliates through dealer/distributor sales channels, as reduced by returns and discounts and other reductions pursuant to the terms of the Merchandising Agreement ('Normal Dealer Sales'). The term 'Base Price' means the royalty base price applicable to the royalty payable to [Iovine] and Dre under the Merchandising Agreement. The term 'Headphone' means a headphone that only embodies the Headphones Design depicted in Schedule I hereto, and any minor or cosmetic modifications in the design specifically identified on Schedule I hereto."

Schedule I states: "Reference to Headphones Design Patent Application," and includes 14 illustrations of the headphone model from various angles.

Also in the "Terms and Conditions" section, the Agreement states: "**Headphones Design Subject to Royalty:** The only headphones or other products that are subject to the Base Royalty and the Supplemental Royalty are the Headphones."

## IV. Extrinsic evidence

First, the court provisionally receives all credible evidence concerning the parties' intentions to determine whether the contract language is reasonably susceptible to the interpretation urged by the parties. If it is reasonably susceptible to the interpretation urged by the parties, the evidence is then admitted to aid in interpreting the contract. (*Wolf v. Superior Court*, *supra*, 114 Cal.App.4th at p. 1351.)

Here, the trial court received extrinsic evidence regarding the parties' intent.

### A. The Beats parties' and Brunner's extrinsic evidence

The Beats parties and Brunner provided evidence that, at the time the Royalty Agreement was signed, the headphones design and the entire venture was a work in progress. They had not yet finalized a design for the first headphone. Iovine, Dre, and Brunner each provided a declaration stating that they intended the 2007 Royalty Agreement to be a one-product deal covering only the headphone they were working on at that time, which was ultimately released as the Studio. The Beats parties and Brunner

15

emphasize that Iovine, Dre and Brunner -- who signed on behalf of his partners at Pentagram, Lorenzo Apicella and Kit Hinrichs -- are the only signatories to the Royalty Agreement. Therefore, they argue, the evidence of the signatories' intent is uncontradicted. In fact, all parties to the Royalty Agreement: Iovine, Dre, Brunner, Hinrichs, and Apicella, declared under oath that at the time they signed the agreement, they intended it to be a one-product deal.

The Beats parties further provided evidence that, because they didn't know whether or not the product would be successful, the signatories to the Royalty Agreement did not contemplate subsequent headphone models at the time they signed the agreement. Neither Iovine nor Dre would have signed the Royalty Agreement had it required them to pay Pentagram a royalty on anything other than a single model of headphones. Although it turned out that the Studio model was successful and that other models were launched years later, the Beats parties' understanding was that Lamar was entitled to royalties for only the Studio model. The Beats parties argue that the purportedly undisputed mutual intention of the parties to the Royalty Agreement to make payment on a single "headphone" controls.

### B. Lamar's extrinsic evidence

Lamar, on the other hand, provided evidence that prior to the 2006 lawsuit, he, Brunner, and the Beats parties were contemplating more than just one model of headphone. Lamar produced PowerPoint presentations from April and July 2006 that demonstrated that the parties were contemplating at least three headphone models based on the headphones design: a noise-cancelling model, a non-noise-cancelling model, and a Bluetooth wireless model. In addition, Lamar produced letters written in May and June 2006 from Iovine and Dre's lawyers that referenced the parties' collaboration on multiple headphone products. Further, the very complaint which Iovine and Dre filed in June 2006, which precipitated the need for the 2007 settlement, described the parties' collaboration on a "line of headphones" ("This action arises from Defendants' breach of an oral contract for Defendants to manufacture, market, and distribute a line of headphones designed by Plaintiffs under the trademark 'Beats.'").

16

Lamar also presented e-mails between the parties during settlement negotiations that contemplated further iterations of the headphones design. For example, there is an e-mail from Brunner to Iovine's representative, Berman, dated August 13, 2006, stating that any settlement must include royalty payments on "the product and its iterations." In a second e-mail between Brunner and Berman, Brunner describes a "[n]ext product version," including a possible "compact version."

Lamar's own declaration states that it was his belief that "from the outset, [the headphones design was] intended to be an iconic design that would be common to multiple versions of the product design, such as a wireless version, a smaller, compact version, and subsequent interactions as technology and demand would dictate."

Lamar also produced evidence of the Beats parties' use of the original patent, drawings for which were attached as Schedule I to the Royalty Agreement, to market and protect subsequent versions of the Beats headphone. In 2010, after Beats released the Solo headphone, Beats sued a company called Fanny Wang over their similar headphones design, asserting that both the Solo and Studio headphones emanated from a design for which Beats obtained patent protection with the 077 Patent.

Similarly, Lamar produced evidence that the Beats parties marked the box of the Solo model headphone with the legal disclaimer that it is "protected by U.S. Patent No. D552,077," necessarily admitting that the Solo design embodies the headphones design depicted in the Schedule I drawings. In addition, in describing the creation of the Beats Wireless headphone, Brunner advertised that he and Beats "really wanted to build it out of classic Beats DNA, which is very much about the original Studio headphone, and then the Solo headphone." And in May 2010, when Lamar first questioned his failure to receive royalties on the Solo model, Brunner explicitly told Lamar that if Beats created a "blue tooth version" of the Beats design, it would be covered by the Royalty Agreement, as would "changes to the Studio platform."

Finally, Lamar produced expert testimony that the objective manifestation of the Royalty Agreement was that it covered a headphones design, the Beats design, which could be, and was, used in multiple headphone models.

17

This evidence produced by Lamar contradicts the parties' present assertions that at the time they signed the Royalty Agreement, they only contemplated that it would cover a single headphone model, the Studio model. Thus, contrary to the Beats parties' position, the evidence of their intent is not uncontradicted.

### C. *Lamar's extrinsic evidence is relevant*

The Beats parties and Brunner argue that because Lamar was not a signatory to the Royalty Agreement, his evidence regarding the parties' intent is irrelevant. The trial court apparently agreed, finding that the evidence supporting the Beats parties' interpretation of the Royalty Agreement was "uncontroverted." The trial court further found that "[n]o material factual dispute exists that each of the parties who signed the Royalty Agreement agreed to and intended to pay to Pentagram a 4 percent royalty on the one model of headphones they were working on at the time which eventually became the Studio model headphone." We disagree with the trial court's conclusion that no material factual dispute exists as to what the parties to the Royalty Agreement agreed to and intended at the time they signed the agreement.

First, we note that the question of whether Lamar is a party to the Royalty Agreement is not easily answered by the fact that his signature does not appear on the document. The Royalty Agreement was specifically referenced in the GSA, and was attached thereto as exhibit A. The GSA stated clearly that its intent was to resolve the rights of the parties, including Lamar. Lamar read and understood the entire negotiated agreement -- which consisted of three contracts -- before signing it.[7] Lamar was certainly a party to the larger settlement agreement, and the Royalty Agreement was part of this larger negotiated deal.

Under Civil Code section 1642, "[s]everal contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be

---

[7] In contrast, Iovine admitted in deposition testimony that he lacked personal knowledge of the specific contents of the GSA and attached Royalty Agreement. Dre could not recall whether he reviewed the contract before he signed it.

18

taken together."  Lamar was a party to two of the three contracts, all of which were executed as part of a single settlement.  To discredit Lamar's understanding of the settlement -- including the Royalty Agreement -- under the circumstances, is error.[8]  (See also Civil Code, § 1647 ["A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates."].)

Even if Lamar is considered only a third party beneficiary to the Royalty Agreement, his evidence contradicting the Beats parties' testimony regarding the meaning of the Royalty Agreement is relevant.  The trial court should consider "testimony as to the 'circumstances surrounding the making of the agreement . . . including the object, nature and subject matter of the writing . . .' so that the court can 'place itself in the same situation in which the parties found themselves at the time of contracting.' [Citations.]" (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 40.)  "'In determining the meaning of a written contract allegedly made, in part, for the benefit of a third party, evidence of the circumstances and negotiations of the parties in making the contract is both relevant and admissible.' [Citations.]" (*Spinks v. Equity Residential Briarwood Apartments* (2009) 171 Cal.App.4th 1004, 1024.)

Despite Lamar's involvement in the 2007 settlement agreement, the Beats parties continue to argue that his evidence is not relevant because all signatories to the Royalty

---

[8]     "Although Civil Code section 1642 references the 'same parties,' the common law rule is not so limited.  [Citation.]  Where, as here, the written instruments are all part of the same transaction, they may be considered together even when the counterparties to each instrument are different.  [Citations.]" (*Holguin v. Dish Network LLC* (2014) 229 Cal.App.4th 1310, 1322).  This is especially so where "the record reflects substantial interrelationships between and among the counterparties here." (*Ibid.*)  (See also *Goodman v. Severin* (1969)  274 Cal.App.2d 885, 895 ["where two or more written instruments are executed contemporaneously, with reference to each other, for the purpose of attaining a preconceived objective, they must all be construed together and effect given if possible to the purpose intended to be accomplished; and this principle controls whether each of the several instruments was signed by all or only some of the parties to the transaction"].)

Agreement now agree as to their intent at the time the agreement was signed eight years ago. They argue that "[w]here the parties have attached the same meaning to a promise or agreement or term thereof, it is interpreted in accordance with that meaning." (Rest.2d Contracts, § 201, subd. (1).)[9] The Beats parties cite one California case in support of this proposition: *Western Medical Enterprises, Inc. v. Albers* (1985) 166 Cal.App.3d 383, 391 [parties' predispute construction of contract will, when reasonable, be adopted by the courts].) The case does not suggest that Lamar's evidence is irrelevant or should not be considered.

The Beats parties also cite *A.H.D.C. v. City of Fresno* (E.D.Cal. Aug. 31, 2000, Civ. A. No. CV-F-97-5498) 2000 WL 35810722 at *9.[10] The case cites Civil Code section 1649, which provides: "If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." The case holds that third party beneficiaries are "not covered by section 1649 for purposes of contract interpretation." (*A.H.D.C.*, *supra*, at *9.) The case is distinguishable. In addition to being a third party beneficiary of the Royalty Agreement, Lamar was a party to the GSA, on which the Royalty Agreement was based. Further, even if he had been nothing more than a third party beneficiary to the Royalty Agreement, Lamar has presented evidence beyond his

---

**9** The Beats parties cite numerous out-of-state cases without any discussion of whether or not these cases purport to apply California law. (*Moriarty v. Svec* (7th Cir. 1998) 164 F.3d 323, 330-332; *Baladevon, Inc. v. Abbott Labs., Inc.* (D.Mass. 1994) 871 F.Supp. 89; *Wilmington Firefighters Assn. v. City of Wilmington* (Del.Ch. Mar. 12, 2002, No. CIV.A. 19035) 2002 WL 418032; *Pennzoil Co. v. Federal Energy Regulatory Com.* (5th Cir. 1981) 645 F.2d 360; *Sunbury Textile Mills, Inc. v. Commissioner* (3d Cir. 1978) 585 F.2d 1190.) Because the Beats parties have failed to show the relevance of these cases, we will not discuss them.

**10** Federal district court cases are not binding authority in this court. However, the California Rules of Court do not prohibit citation to unpublished federal cases, which may properly be cited as persuasive authority. (Cal. Rules of Court, rule 8.1115; *Landmark Screens, LLC v. Morgan, Lewis & Bockius, LLP* (2010) 183 Cal.App.4th 238, 251, fn. 6.)

own understanding of the intent of the parties to the Royalty Agreement. He has produced objective evidence and statements from the parties to the agreement themselves contradicting their own present statements of intent and calling their current testimony into doubt.

## V. Analysis of extrinsic evidence and reasonable susceptibility to the competing interpretations of the Royalty Agreement

After reviewing the extrinsic evidence, we must determine whether the Royalty Agreement is reasonably susceptible to the parties' competing interpretations.

### A. The Beats parties' and Brunner's proposed contract interpretation

We first address whether the declarations filed by the Beats parties and Brunner render the Royalty Agreement susceptible to an interpretation that it is a "one product" deal covering only the Studio model headphone.

The key language of the Royalty Agreement states: "The term 'Headphone' means a headphone that only embodies the Headphones Design depicted in Schedule I hereto, and any minor or cosmetic modifications in the design specifically identified on Schedule I hereto."

The Beats parties suggest an interpretation that focuses on the word "a" in this clause. They contend that this clause defines the term "Headphone" as "*a* headphone," a singular product. If the parties had intended to pay a royalty on every headphone embodying the headphones design, the Beats parties argue, they would have defined the term "Headphone" as "every headphone." The Beats parties ignore the use of the term "Headphone" in the plural in other parts of the agreement. For example, in the Recitals to the Royalty Agreement, Iovine and Dre agreed to "pay a royalty to Pentagram on revenue generated by sales of Headphones." If the singular suggests a single product, then this use of the plural suggests that more than a single product might be sold.

In addition, the Royalty Agreement provides that "[t]he only headphones or other products that are subject to the Base Royalty and the Supplemental Royalty are the Headphones." Again, the plural is used, suggesting that the agreement contemplates inclusion of more than just a singular product. If "a headphone" is a single product that

embodies the headphones design, then it logically follows that the plural, "headphones," describes multiple products embodying that design.

The use of the word "a" in the definition of the term "Headphone" does not permit the contract to be interpreted as relating to only a single product as a matter of law. The language of the contract as a whole strongly suggests that it was intended to apply to headphones that embody the headphones design depicted in Schedule I, without restriction to a single product. (Civ. Code, § 1641 ["The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."].)

The Beats parties cite no other contractual language supporting their interpretation of the Royalty Agreement. Instead, they refer to the intention of the parties, as set forth in the declarations prepared for this litigation, which they describe as "uncontroverted."

We disagree with the Beats parties' description of their evidence as "uncontroverted." As discussed, Lamar presented conflicting evidence suggesting that the parties had contemplated a line of headphones including several different models. However, in light of the evidence presented by the Beats parties, and the contractual language, we find that it is plausible that the parties intended the Royalty Agreement to apply to a single product.

### B. Lamar's proposed interpretation

Based on the extrinsic evidence presented and the language of the contract, we find that it is equally, if not more, plausible that the parties contemplated the interpretation for which Lamar advocates.

Generally, "[i]t is the outward expression of the agreement, rather than a party's unexpressed intention, which the court will enforce. [Citation.]" (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1166.) In this case, as Lamar points out, the Royalty Agreement is entered into "pursuant to" the GSA, and is attached to the GSA as exhibit A. The GSA makes it clear that the parties (including Lamar) designed certain headphones, depicted in Schedule I, "to be marketed and sold under certain names and trademarks including, but not limited to, 'Beats by Dr. Dre." The GSA and its related agreements were intended to

22

resolve the parties' respective rights to that headphones design: "The Parties desire to reach a full and final compromise and settlement of the claims and counterclaims in the Action and to resolve the Parties' respective rights, including intellectual property rights, in the Headphones Design and Marks."

The Royalty Agreement, attached to the GSA as exhibit A, was entered into "pursuant to" the GSA. In the Royalty Agreement, the Beats parties agreed to pay to Pentagram (and thus to Lamar) a percentage of "every Headphone sold by Monster and its Affiliates." The "Headphone" was defined as "a headphone that only embodies the Headphones Design depicted in Schedule I hereto, and any minor or cosmetic modifications in the design specifically identified on Schedule I hereto." There is no language in the contract limiting the agreement to a single model or product. Instead, the focus of the agreement is on the patented design on which the parties collaborated.

Lamar has presented evidence that other headphone models, such as the Solo, were protected by the same patent granted on the headphones design illustrated in Schedule I of the Royalty Agreement. He has also presented evidence that the parties, including Brunner, contemplated that a wireless model based on the headphones design would be covered by the Royalty Agreement. Thus, the agreement is certainly reasonably susceptible to an interpretation that it covers more than just the original, Studio, headphone model.

### C. Conclusion

We reverse the trial court's determination that no ambiguity exists as a matter of law. We find that the contract is ambiguous as to whether it contemplated royalties only for the Studio headphone model or for other headphones that embody the headphones design depicted in Schedule I to the Royalty Agreement. The extrinsic evidence thus must be admitted to assist in the second step of contract interpretation. The factual conflict in the evidence regarding the meaning of the contract must be resolved by a jury. (*Lonely Maiden Productions, LLC v. GoldenTree Asset Management, LP*, *supra*, 201 Cal.App.4th at pp. 376-377.)

## VI. Lamar's tort claims against Brunner

The trial court relied on its summary judgment in favor of the Beats parties and Brunner on the contract claims to dismiss Lamar's claims against Brunner for breach of fiduciary duty and tortious interference. Because we reverse the summary judgment on the contract claims, we also reverse the summary judgment on the tort claims against Brunner.

The sole basis for Brunner's summary judgment motion below was that Lamar's tort claims are time-barred. Generally speaking, we review the trial court's ruling, not its reasoning, and may affirm if the ruling was correct on any ground. (*People v. Zamudio* (2008) 43 Cal.4th 327, 351, fn. 11) However, it is inappropriate to do so here as Brunner's statute of limitations arguments involve significant factual disputes about when Lamar was put on notice of his claims.

Resolution of a statute of limitations issue is normally a question of fact, unless uncontradicted facts are susceptible to only one legitimate inference. (*Jolly v. Eli Lily & Co.* (1988) 44 Cal.3d 1103, 1112.) Here, while the parties agree on certain facts, they strongly disagree as to the inference created by those facts. Both parties agree that Lamar received a royalty statement on May 12, 2010, for first quarter 2010 sales of the Studio headphone. On May 20, 2010, Lamar forwarded the statement to Brunner via e-mail, with the question: "Doesn't our agreement call for royalty payments on derivative products? . . . like the 'solo' product and coming 'pro' product . . . clearly a derivative of the Studio product, aren't they? [¶] Thoughts?"

On the same date, Brunner responded with the following e-mail:

> "Absolutely not. Those are ground up products designed by me here at Ammunition under our own agreement with Monster, with significant investment on my part. The [*sic*] carry some beats DNA of course, but to think any product with the Beats design language comes under the Pentagram agreement is not correct. Derivative products really only cover minor cosmetic changes to the Studio platform such as color variations, special editions, etc. If we do a blue tooth version, etc."

24

Lamar's claims against Brunner were filed on May 16, 2014.  Thus, if the jury were to decide that Lamar knew, or should have known, of his claims against Brunner on May 12, 2010, Lamar's claims would likely be barred under the applicable four-year statute of limitations.  (Code Civ. Proc., § 343.)  However, Lamar provides potential explanations as to why the royalty statement provided on May 12, 2010, did not immediately clue him in to the existence of his claims:  the failure to provide royalties on the Solo model could have been an oversight or a nonpayment due to marketing expenses.  Alternatively, it was possible that a payment would be forthcoming on a separate royalty statement.  If the jury were to determine that Lamar was not aware of Brunner's alleged tortious conduct until May 20, 2014 -- when Brunner informed him that he would not be receiving royalties on the Solo -- then Lamar's claims are timely.  The question is one of fact.

The same is true for Lamar's tortious interference claims, which are subject to a two-year statute of limitations.  (Code Civ. Proc., § 339.)  Despite the e-mail exchange in May 2010, it is for a jury to determine whether Brunner's May 20, 2010 e-mail put Lamar on notice of Brunner's alleged tortious interference with his right to receive royalties on future models, such as the Studio Remastered (released in mid-2013).[11]

## DISPOSITION

The judgment is reversed, and the matter is remanded for trial.  Appellants are awarded costs of appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

BOREN, P.J.

We concur:

ASHMANN-GERST, J.          HOFFSTADT, J.

---

[11]     We decline to address the parties' competing arguments regarding the continuous accrual doctrine.  (*Aryeh v. Canon Bus. Solutions, Inc.* (2013) 55 Cal.4th 1185, 1197.)  This doctrine should be addressed in the first instance by the trial court depending on the factual determinations made at the trial court level.